

EBP/TPW/GDB: USAO 2016R00037



FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 NOV 29  PM 4: 06

AT GREENBELT

BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO. PX-17-472** |
| **v.** | * | |
| | * | **(Conspiracy to Commit Securities** |
| **DAWN J. BENNETT** and | * | **Fraud, 18 U.S.C. § 371; Securities** |
| **BRADLEY C. MASCHO,** | * | **Fraud, 15 U.S.C. §§ 78j(b) & 78ff;** |
| | * | **Wire Fraud Conspiracy, 18 U.S.C.** |
| **Defendants** | * | **§ 1349; Wire Fraud, 18 U.S.C. § 1343;** |
| | * | **Bank Fraud, 18 U.S.C. § 1344; False** |
| | * | **Statements on Loan Application,** |
| | * | **18 U.S.C. § 1014; Aiding and Abetting,** |
| | * | **18 U.S.C. § 2; Forfeiture, 18 U.S.C.** |
| | * | **§§ 981(a)(1)(C) and 982(a)(2)(A),** |
| | * | **21 U.S.C. § 853, and 28 U.S.C. § 2461))** |
| | * | |

\*\*\*\*\*\*\*

## SUPERSEDING INDICTMENT

### COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Superseding Indictment:

### Introduction

1.    Defendant **DAWN J. BENNETT ("BENNETT")** was a resident of Maryland.

2.    Defendant **BRADLEY C. MASCHO ("MASCHO")** was a resident of Maryland and **BENNETT**'s associate.

3.    DJB Holdings, LLC was a holding company solely owned and controlled by **BENNETT**.

4.      DJB Holdings, LLC, and Province of the Dragon, LLC, doing business as DJBennett.com (hereinafter "DJB Holdings"), was an internet retail business that sold sports apparel.

5.      **BENNETT** was the Chief Executive Officer of DJB Holdings.

6.      **MASCHO** acted as the Chief Financial Officer of DJB Holdings.

7.      **BENNETT** had sole signatory authority for at least the following bank accounts:

a.      United Bank account ending in 2054 in **BENNETT**'s name ("United 2054 Account");

b.      Revere Bank (formerly Monument Bank) account ending in 2660 in the **BENNETT**'s name ("Revere 2660 Account");

c.      EagleBank account ending in 2656 in the name of DJB Holdings, LLC ("EagleBank 2656 Account");

d.      First Republic Bank account ending in 2861 in the name of DJB Holdings, LLC ("FRB 2861 Account"); and

e.      Revere Bank (formerly Monument Bank) account ending in 2678 in the name of DJB Holdings LLC ("Revere 2678 Account").

8.      The Financial Industry Regulatory Authority ("FINRA") was a non-governmental organization that regulated the broker-dealer industry in order to protect investors and market integrity.

### Background

9.      Between at least in or about 2009 and in or about November 2015, **BENNETT** was a registered representative and investment advisor affiliated with various brokerage firms. **BENNETT** provided investment advice and financial services to clients in Maryland and

2

elsewhere through her firm, Bennett Group Financial Services, LLC ("BGFS"). BGFS had office locations in Washington, D.C.

10.     Beginning at least in on or about 2009, **MASCHO** worked with **BENNETT** at BGFS.

11.     On or about March 19, 2013, **BENNETT** formed DJB Holdings, LLC, d/b/a DJBennett.com, in the State of Delaware.

12.     Beginning at least in or about November 2014, **BENNETT** and **MASCHO** attempted to obtain and did obtain loans from financial institutions and commercial lenders ("Lenders") on behalf of DJB Holdings.

13.     Beginning at least in or about December 2014, **BENNETT** and **MASCHO** sold Convertible Promissory Notes and various iterations thereof ("Convertible Notes") to multiple individuals, including current and former BGFS clients ("DJ Bennett Investors"). The Convertible Notes were securities.

14.     On or about November 6, 2015, BGFS was subject to a FINRA on-site examination.

15.     On or about November 24, 2015, **BENNETT** resigned from Western International Securities and began working full-time for DJB Holdings in office space co-located with BGFS in Washington, D.C.

### The Conspiracy and its Objects

16.     Between at least in or about November 2014 and in or about August 2017, in the District of Maryland and elsewhere, the defendants,

**DAWN J. BENNETT and
BRADLEY C. MASHCO,**

did knowingly conspire, confederate, and agree with each other and other persons, known and unknown to the Grand Jury, to commit an offense against the United States, to wit, to knowingly and intentionally, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, by (1) employing a device, scheme, and artifice to defraud; (2) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of the DJB Holdings Convertible Notes.

### The Purpose of the Conspiracy

17.     It was a purpose of the conspiracy for **BENNETT** and **MASCHO** to solicit and obtain millions of dollars from DJ Bennett Investors through false and misleading pretenses, representations, and promises.

18.     It was a further purpose of the conspiracy for **BENNETT** and **MASHCO** to conceal DJB Holdings' true financial condition from DJ Bennett Investors and Lenders.

19.     It was a further purpose of the conspiracy for **BENNETT** and **MASHCO** to conceal the manner in which **BENNETT** and **MASCHO** were spending DJB Holdings' money from DJ Bennett Investors and Lenders.

20.     It was a further purpose of the conspiracy to enrich **BENNETT** and **MASCHO** at the expense of DJ Bennett Investors and Lenders.

**Manners and Means**

21.    The conspiracy was carried out through the following manner and means, among

others:

a.    **BENNETT** recruited DJ Bennett Investors, some of whom were BGFS

clients, to invest in and loan money to DJB Holdings.

b.    **BENNETT** and **MASCHO** made misrepresentations to DJ Bennett

Investors in order to entice them to invest in and loan money to DJB Holdings.

c.    **BENNETT** and **MASCHO** intentionally overstated DJB Holdings' sales

to DJ Bennett Investors.

d.    **BENNETT** and **MASCHO** intentionally understated DJB Holdings'

liabilities to DJ Bennett Investors.

e.    **BENNETT** and **MASCHO** made false and misleading statements about

the manner in which and purpose for which the DJ Bennett Investors' funds would be used.

f.    **BENNETT** convinced several DJ Bennett Investors to withdraw a

significant portion of their retirement accounts to invest in and loan money to DJB Holdings.

g.    **MASCHO** assisted BGFS clients in withdrawing their retirement funds

("the retirement funds") to invest in and loan money to DJB Holdings.

h.    In order to avoid detection by regulators, **BENNETT** and **MASCHO**

caused the retirement funds to be sent first to bank accounts held by DJ Bennett Investors before

being transferred to a DJB Holdings account, instead of sending the funds directly to a DJB

Holdings account.

i.      After the DJ Bennett Investors invested in and loaned money to DJB Holdings, **BENNETT** and **MASCHO** deceived and defrauded DJ Bennett Investors by making false and misleading statements about DJB Holdings' ongoing financial condition.

j.      Between approximately December 2014 and November 2015, **BENNETT** and **MASCHO** solicited investments using Convertible Notes.

k.      In the Convertible Notes, **BENNETT** promised high rates of return, typically around 15% per annum.

l.      Following the November 6, 2015 FINRA on-site examination, **BENNETT** and **MASCHO** induced DJ Bennett Investors to replace the Convertible Notes with Promissory Notes in an effort to conceal the fact that **BENNETT** and **MASCHO** had unlawfully issued the Convertible Notes to DJ Bennett Investors.

m.      **BENNETT** and **MASCHO** drafted and caused to be drafted DJ Bennett Investor affidavits that misrepresented that **BENNETT** had explained the risks of investing in DJB Holdings.

n.      **BENNETT** and **MASCHO** caused certain DJ Bennett Investors to sign the affidavits that misrepresented that **BENNETT** had explained the risks of investing in DJB Holdings.

o.      Between approximately November 2015 and July 2017, **BENNETT** solicited additional investments and loans from DJ Bennett Investors. In exchange for these investments and loans, **BENNETT** and **MASCHO** created and caused to be created, and executed and caused to be executed nine-month and shorter-term Promissory Notes. In these Promissory Notes, **BENNETT** promised DJ Bennett Investors high rates of return with little to no risk, typically 15% interest after nine months, knowing that such returns were not realistic.

6

      p.     **BENNETT** misrepresented to DJ Bennett Investors that their investments and loans were highly liquid and were guaranteed by DJB Holdings' inventory, DJB Holdings' assets, and by **BENNETT** herself.

      q.     **BENNETT** told certain DJ Bennett Investors that there was a minimum investment for DJB Holdings. In order to obtain additional funds, after these DJ Bennett Investors met the purported minimum investment threshold, **BENNETT** told these DJ Bennett Investors that the minimum increased.

      r.     Rather than repaying certain DJ Bennett Investors when the Promissory Notes matured, **BENNETT** and **MASCHO** caused certain DJ Bennett Investors to "roll over" their financial commitments to DJBennett.com, that is, to defer repayment for an additional period of time during which interest purportedly would accrue.

      s.     In or about April 2017, **BENNETT** changed the name of DJB Holdings, LLC, to Province of the Dragon, LLC.

      t.     Between in or about December 2014 and in or about July 2017, **BENNETT** and **MASCHO** solicited and received over $20 million from more than 40 different DJ Bennett Investors.

### Overt Acts

22.     In furtherance of the conspiracy and to achieve its purposes, **BENNETT**, **MASCHO**, and their co-conspirators committed the following overt acts, among others, in the District of Maryland and elsewhere:

      a.     On or about January 26, 2015, **MASCHO** sent an email to **BENNETT** containing a DJBennett.com Business Plan with false and misleading statements about

DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

*Victim A*

b.      On or about March 17, 2015, **BENNETT** sent an email to Victim A that included a DJBennett.com Business Plan that contained false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

c.      On or about March 19, 2015, **MASCHO** sent an email to Victim A with a Letter of Authorization to assist Victim A in withdrawing funds from Victim A's retirement account to invest in and loan money to DJB Holdings.

d.      On or about March 19, 2015, **BENNETT** caused Victim A to send by wire $25,000 to the FRB 2861 Account.

e.      On or about June 3, 2015, **BENNETT** sent Victim A an email that contained false and misleading statements regarding DJBennett.com's revenue.

f.      On or about July 14, 2015, **BENNETT** caused Victim A to send by wire $52,000 to the FRB 2861 Account.

g.      On or about July 14, 2015, **BENNETT** caused Victim A to send by wire $120,000 to the FRB 2861 Account.

h.      On or about July 23, 2015, **MASCHO** sent Victim A an email that contained Convertible Notes reflecting Victim A's previous investments.

i.      On or about November 16, 2015, **BENNETT** sent **MASCHO** an email that contained a link to an internet post titled "Is Our Promissory Note a Security?"

8

j.      On or about November 16, 2015, **MASCHO** sent **BENNETT** an email that contained two Promissory Notes for Victim A reflecting Victim A's previous investments.

k.      On or about November 16, 2015, **BENNETT** sent Victim A an email that contained the Promissory Notes in order to obtain Victim A's signature.

l.      On or about November 26, 2015, **MASCHO** sent **BENNETT** an email that contained an unsigned affidavit for Victim A that misrepresented that Victim A signed a short-term promissory note on March 19, 2015, the day Victim A invested in the Convertible Note.

m.      On or about November 27, 2015, **BENNETT** emailed Victim A the affidavit received from **MASCHO** the day before, in order to obtain Victim A's signature.

*Victim B*

n.      On or about April 28, 2015, **BENNETT** sent an email to Victim B that contained various offering documents, including a DJBennett.com Business Plan that contained false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

o.      On or about May 7, 2015, **BENNETT** caused Victim B to send by wire $70,000 to the FRB 2861 Account.

p.       On or about May 15, 2015, **BENNETT** caused Victim B to send by wire $30,000 to the FRB 2861 Account.

q.      On or about August 25, 2015, **BENNETT** caused Victim B to send by wire $253,000 to the FRB 2861 Account.

r.      On or about August 28, 2015, **MASCHO** sent to Victim B an email that contained an executed signature page from a DJ Bennett Holdings LLC Convertible Note.

9

*Victim C*

s.      On or about October 23, 2015, **BENNETT** sent an email to **MASCHO** and Victim C that contained DJ Bennett offering documents and that promised the investment was fully liquid.

t.      On or about October 26, 2015, **BENNETT** and **MASCHO** caused Victim C to submit a retirement distribution account form in order to withdraw money from Victim C's retirement account to invest in and loan money to DJB Holdings.

u.      On or about October 29, 2015, **BENNETT** and **MASCHO** caused Victim C to send by wire $100,000 to the FRB 2861 Account.

v.      On or about October 29, 2015, after receiving $100,000 from Victim C, **BENNETT** paid $50,000 to a law firm for a purpose unrelated to DJB Holdings and which was not for the benefit of DJ Bennett Investors.

w.      On or about October 29, 2015, after receiving $100,000 from Victim C, **BENNETT** caused to be sent by wire $15,000 to **BENNETT**'s United Bank 2054 Account.

x.      In or about May 2017, **BENNETT** returned Victim C's DJB Holdings investment, with interest, in part using funds from other investors.

*Victim D*

y.      On or about June 2, 2015, **BENNETT** and **MASCHO** caused Victim D to send by wire $225,000 to the FRB 2861 Account.

*Victim E*

z.      On or about June 3, 2015, **BENNETT** sent Victim E an email that contained a DJBennett.com Business Plan that contained false and misleading statements about

DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

aa.     On or about June 15, 2015, **BENNETT** sent Victim E an email that contained false and misleading statements concerning DJBennett.com's 2015 revenue.

bb.     On or about July 28, 2015, **BENNETT** caused Victim E to send by wire $100,000 to the FRB 2861 Account.

cc.     On or about September 18, 2015, **MASCHO** sent Victim E an email containing an executed Convertible Note dated July 28, 2015, for Victim E's $100,000 financial commitment.

*Victim F*

dd.     On or about June 16, 2015, **BENNETT** sent Victim F an email that contained false and misleading statements on which **BENNETT** and **MASCHO** intentionally overstated DJBennett.com's 2015 revenue and understated DJBennett.com's 2015 liabilities.

ee.     On or about June 24, 2015, **BENNETT** caused Victim F to send by wire $500,000 to the FRB 2861 Account.

ff.     On or about July 7, 2015, **MASCHO** sent Victim F an email that contained an executed Convertible Note dated June 24, 2015 for Victim F's $500,000 financial commitment.

*Victim G*

gg.     On or about August 17, 2015, **BENNETT** caused Victim G to send by wire $150,000 to the FRB 2861 Account.

hh.     On or about August 21, 2015, **BENNETT** and **MASCHO** caused Victim G to send an email to **MASCHO** containing a signature page relating to Victim G's $150,000 investment.

18 U.S.C. § 371

## COUNTS TWO THROUGH FIVE
### (Securities Fraud)

The Grand Jury for the District of Maryland further charges that:

1.          Paragraphs 1 through 15, 17 through 20, and Subparagraphs (a) through (t) of

Paragraph 21 of Count One of this Superseding Indictment are incorporated here.

2.          On or about the dates listed below, in the District of Maryland and elsewhere, the

defendants,

### DAWN J. BENNETT and
### BRADLEY C. MASCHO,

unlawfully, willfully, and knowingly, by the use of means and instrumentalities of interstate

commerce and the mail, directly and indirectly, used and employed, in connection with the

purchase and sale of securities listed below, manipulative and deceptive devices and

contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing a device, scheme, and artifice to defraud; (b) making untrue statements of material

facts and omit to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; and (c) engaging in acts,

practices, and courses of business which operated and would operate as a fraud and deceit upon

other persons, in connection with the purchase and sale of the securities listed below:

| COUNT | APPROXIMATE DATE | INVESTOR | SECURITY | PURCHASE PRICE |
|---|---|---|---|---|
| 2 | June 24, 2015 | Victim F | DJ Bennett Holdings, LLC Convertible Note | $500,000 |

13

| COUNT | APPROXIMATE DATE | INVESTOR | SECURITY | PURCHASE PRICE |
|---|---|---|---|---|
| 3 | July 28, 2015 | Victim E | DJ Bennett Holdings, LLC Convertible Note | $100,000 |
| 4 | August 17, 2015 | Victim G | DJ Bennett Holdings LLC Convertible Note | $150,000 |
| 5 | August 25, 2015 | Victim B | DJ Bennett Holdings LLC Convertible Note | $253,000 |

15 U.S.C. §§ 78j(b) and 78ff(a)
17 C.F.R. § 240.10b-5
18 U.S.C. § 2

## COUNT SIX
### (Wire Fraud Conspiracy)

The Grand Jury for the District of Maryland further charges that:

1.        Paragraphs 1 through 15 of Count One of this Superseding Indictment are incorporated here.

### The Conspiracy and Scheme to Defraud

2.        Between at least in or about December 2014 and in or about July 2017, in the District of Maryland and elsewhere, the defendants,

**DAWN J. BENNETT and
BRADLEY C. MASCHO,**

did knowingly and intentionally conspire, with each other and with others known and unknown to the Grand Jury, to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud DJ Bennett Investors and Lenders, and to obtain money and property from DJ Bennett Investors and Lenders, by means of materially false and fraudulent pretenses, representations, promises, and omissions ("the scheme to defraud"), and for the purpose of executing and attempting to execute the scheme to defraud, transmitted and caused to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

### The Purpose of the Conspiracy

3.        It was a purpose of the conspiracy for **BENNETT** and **MASCHO** to solicit and obtain millions of dollars from DJ Bennett Investors and Lenders through false and misleading pretenses, representations, and promises.

15

**Manner and Means of the Conspiracy and Scheme to Defraud**

4.      Subparagraphs (a) through (t) of Paragraph 21 of Count One of this Superseding Indictment are incorporated here.

**Overt Acts**

5.      In furtherance of the conspiracy, and to effect the objects thereof, the defendants, **BENNETT** and **MASCHO**, and others known and unknown to the Grand Jury, committed and caused to be committed the following acts, among others, in the District of Maryland and elsewhere:

a.      On or about January 26, 2015, **MASCHO** sent an email to **BENNETT** containing a DJBennett.com Business Plan with false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

b.      On or about March 17, 2015, **BENNETT** sent an email to Victim A that included a DJBennett.com Business Plan that contained false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

c.      On or about March 18, 2015, **BENNETT** sent Victim F an email that contained offering documents, including a DJBennett.com Business Plan containing false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

d.      On or about March 19, 2015, **BENNETT** caused Victim A to send by wire $25,000 to the FRB 2861 Account.

16

e.      On or about April 8, 2015, **BENNETT** caused Victim F to send by wire $250,000 to the FRB 2861 Account.

f.      On or about April 28, 2015, **BENNETT** sent an email to Victim B that contained various offering documents, including a DJBennett.com Business Plan that contained false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales.

g.      On or about May 7, 2015, **BENNETT** caused Victim B to send by wire $70,000 to the FRB 2861 Account.

h.      On or about May 15, 2015, **BENNETT** caused Victim B to send by wire $30,000 to the FRB 2861 Account.

i.      On or about June 2, 2015, **BENNETT** and **MASCHO** caused Victim D to send by wire $225,000 to the FRB 2861 Account.

j.      On or about June 3, 2015, **BENNETT** sent Victim E an email that contained a DJBennett.com Business Plan that contained false and misleading statements about DJBennett.com's financial condition, including a profit and loss statement that overstated DJBennett.com's sales and a balance sheet that understated DJBennett.com's total liabilities.

k.      On or about June 3, 2015, **BENNETT** sent Victim A an email that contained false and misleading statements regarding DJBennett.com's revenue.

l.      On or about June 15, 2015, **BENNETT** sent Victim E an email that contained false and misleading statements concerning DJBennett.com's 2015 revenue.

m.      On or about June 16, 2015, **BENNETT** sent Victim F an email that contained false and misleading statements on which **BENNETT** and **MASCHO** intentionally overstated DJBennett.com's 2015 sales.

n.     On or about June 24, 2015, **BENNETT** caused Victim F to send by wire $500,000 to the FRB 2861 Account.

o.     On or about July 7, 2015, **MASCHO** sent Victim F an email containing an executed Convertible Note dated June 24, 2015 relating to Victim F's $500,000 financial commitment.

p.     On or about July 14, 2015, **BENNETT** caused Victim A to send by wire $52,000 to the FRB 2861 Account.

q.     On or about July 14, 2015, **BENNETT** caused Victim A to send by wire $120,000 to the FRB 2861 Account.

r.     On or about July 23, 2015, **MASCHO** sent Victim A an email that contained Convertible Notes reflecting Victim A's previous investments.

s.     On or about July 28, 2015, **BENNETT** caused Victim E to send by wire $100,000 to the FRB 2861 Account.

t.     On or about August 17, 2015, **BENNETT** caused Victim G to send by wire $150,000 to the FRB 2861 Account.

u.     On or about August 21, 2015, **BENNETT** and **MASCHO** caused Victim G to send an email to **MASCHO** containing a signature page relating to Victim G's $150,000 investment.

v.     On or about August 25, 2015, **BENNETT** caused Victim B to send by wire $253,000 to the FRB 2861 Account.

w.     On or about August 28, 2015, **MASCHO** sent Victim B an email that contained an executed signature page from a DJ Bennett Holdings LLC Convertible Note.

x.      On or about September 18, 2015, **MASCHO** sent Victim E an email containing an executed Convertible Note dated July 28, 2015, for Victim E's $100,000 financial commitment.

y.      On or about October 23, 2015, **BENNETT** sent an email to **MASCHO** and Victim C that contained DJ Bennett offering documents and that promised the investment was fully liquid.

z.      On or about October 26, 2015, **BENNETT** and **MASCHO** caused Victim C to submit a retirement distribution account form in order to withdraw money from Victim C's retirement account to invest in and loan money to DJB Holdings.

aa.      On or about October 29, 2015, **BENNETT** and **MASCHO** caused Victim C to send by wire $100,000 to the FRB 2861 Account.

bb.      On or about October 29, 2015, after having received the $100,000 wire from Victim C, **BENNETT** paid $50,000 to a law firm for a purpose unrelated to DJB Holdings and which was not for the benefit of DJ Bennett Investors.

cc.      On or about October 29, 2015, **BENNETT** caused to be sent by wire $15,000 to **BENNETT's** United Bank 2054 Account.

dd.      On or about November 16, 2015, **BENNETT** sent **MASCHO** an email that contained a link to an internet post titled "Is Our Promissory Note a Security?"

ee.      On or about November 16, 2015, **MASCHO** sent **BENNETT** an email that contained two Promissory Notes for Victim A reflecting Victim A's previous investments.

ff.      On or about November 16, 2015, **BENNETT** sent an email to Victim A that contained the Promissory Notes in order to obtain Victim A's signature.

gg.     On or about November 25, 2015, **MASCHO** sent **BENNETT** an email that contained an unsigned affidavit for Victim A that misrepresented that Victim A signed a short-term promissory note on March 19, 2015, the day Victim A invested in the Convertible Note.

hh.     On or about November 27, 2015, **BENNETT** emailed Victim A the affidavit received from **MASCHO** the day before, in order to obtain Victim A's signature.

ii.     On or about March 7, 2016, **BENNETT** sent to Victim H an email that contained a balance sheet and profit and loss statement for DJB Holdings LLC, which balance sheet omitted from the liabilities section the Convertible Notes and the Promissory Notes, and which profit and loss statement falsely reported sales of over $4.7 million.

jj.     On or about March 9, 2016, **BENNETT** caused Victim H to write a $55,000 check that was deposited into the Revere 2678 Account.

kk.     On or about April 1, 2016, **BENNETT** caused Victim I to send by wire $100,000 to the Revere 2678 Account.

ll.     On or about April 4, 2016, **BENNETT** caused Victim I to send by wire $100,000 to the Revere 2678 Account.

mm.     On or about April 4, 2016, after having received $200,000 from Victim I in the previous three days, **BENNETT** caused to be sent by wire $11,250 to partially repay another investor, Victim J.

nn.     On or about May 17, 2016, **BENNETT** caused Victim L to send by wire $200,000 to the Revere 2678 Account.

oo.     On or about May 17, 2016, in exchange for $200,000, **BENNETT** sent Victim L an email that contained an executed Promissory Note stating: "this is a personal note guaranteed by DJBennett.com and company's assets and account receivables."

pp.     On or about August 8, 2016, **BENNETT** caused Victim N to send by wire $150,000 to the Revere 2678 Account.

qq.     On or about September 22, 2016, **BENNETT** caused Victim E to send by wire $1,000,000 to the Revere 2678 Account.

rr.     On or about November 10, 2016, **BENNETT** caused Victim A to send by wire $67,538 to the Revere 2678 Account.

ss.     On or about December 22, 2016, **BENNETT** caused Victim E to send by wire $1,000,000 to the FRB 2861 Account.

tt.     On or about December 23, 2016, **BENNETT** caused to be sent by wire $363,000 to Victim K, as a partial repayment of Victim K's notes paid for in part with funds received the day prior from Victim E.

uu.     On or about February 16, 2017, in response to an email inquiry from Victim L regarding the status of money due to Victim L, **BENNETT** replied: "we are doing extremely well so the equity step up attached to your note has turned out to be quite beneficial for you."

vv.     On or about June 21, 2017, **BENNETT**, while physically present with Victim M at a financial institution in Maryland, caused Victim M to send by wire $58,500 to the EagleBank 2656 Account.

ww.     On or about June 21, 2017, **BENNETT** and Victim M called Fidelity to obtain approval for the wire transfer to the EagleBank 2656 Account, during which call, **BENNETT** told Fidelity that the money was for "building out bricks and mortar."

xx.     On or about June 21, 2017, after having received $58,500 from Victim M, **BENNETT** caused to be sent by wire $35,000 to **BENNETT**'s United 2054 Account.

yy.     On or about June 21, 2017, after having transferred $35,000 of Victim M's funds to the United 2054 Account, **BENNETT** paid $15,500 of **BENNETT**'s personal mortgage.

zz.     On or about June 28, 2017, **BENNETT** caused Victim M to send by wire $395,476 to the EagleBank 2656 Account.

aaa.     On or about June 28, 2017, after having received $395,476 from Victim M, **BENNETT** caused to be sent by wire $115,000 to a law firm for a purpose unrelated to DJB Holdings and which was not for the benefit of DJ Bennett Investors.

bbb.     On or about July 3, 2017, **BENNETT** caused Victim M to send by wire $101,575 to the EagleBank 2656 Account.

ccc.     On or about July 6, 2017, **BENNETT** caused Victim M to send by wire $136,254 to the EagleBank 2656 Account.

18 U.S.C. § 1349

## COUNTS SEVEN THROUGH FIFTEEN
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 15 of Count One and Paragraphs 3 and 4 of Count Six of this Superseding Indictment are incorporated here.

### The Scheme to Defraud

2.     Between at least in or about November 2014 and in or about August 2017, in the District of Maryland and elsewhere, **BENNETT** devised and intended to devise a scheme and artifice to defraud DJ Bennett Investors and Lenders, and to obtain money and property from DJ Bennett Investors and Lenders, by means of materially false and fraudulent pretenses, representations, promises, and omissions ("the scheme to defraud").

### The Charges

3.     On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### DAWN J. BENNETT,

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communication, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, **BENNETT** transmitted and caused to be transmitted the following:

| COUNT | APPROXIMATE DATE | WIRE TRANSMISSION AND AMOUNT |
|---|---|---|
| 7 | March 9, 2016 | Wire communication between a location in Maryland and a location outside of Maryland caused by deposit of a $55,000 check drawn on Victim H's bank account into the Revere 2678 Account in Maryland |

23

| COUNT | APPROXIMATE DATE | WIRE TRANSMISSION AND AMOUNT |
|---|---|---|
| 8 | April 1, 2016 | Interstate wire communication caused by wire transfer of $100,000 from Victim I's bank account to the Revere 2678 Account in Maryland |
| 9 | April 4, 2016 | Interstate wire communication caused by wire transfer of $100,000 from an account held by Victim I to the Revere 2678 Account in Maryland |
| 10 | May 17, 2016 | Interstate wire communication caused by wire transfer of $200,000 from an account held by Victim L to the Revere 2678 Account in Maryland |
| 11 | August 8, 2016 | Interstate wire communication caused by wire transfer of $150,000 from an account held by Victim N to the Revere 2678 Account in Maryland |
| 12 | September 22, 2016 | Interstate wire communication caused by wire transfer of $1,000,000 from an account held by Victim E to the Revere 2678 Account in Maryland |
| 13 | November 10, 2016 | Interstate wire communication caused by wire transfer of $67,538 from an account held by Victim A to the Revere 2660 Account in Maryland |
| 14 | July 21, 2017 | Interstate wire communication caused by wire transfer of $58,500 from an account held by Victim M to the EagleBank 2656 Account in Maryland |
| 15 | June 28, 2017 | Interstate wire communication caused by wire transfer of $395,476 from an account held by Victim M to the EagleBank 2656 Account in Maryland |

18 U.S.C. § 1343

## COUNT SIXTEEN
### (Bank Fraud)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 8 of Count One of the Superseding Indictment are reallaged

and incorporated here.

2.      Eagle Bancorp, Inc. ("EagleBank") was a financial institution within the meaning

of Title 18, United States Code, Section 20, and had its deposits insured by the Federal Deposit

Insurance Corporation ("FDIC").  EagleBank had locations in Maryland, Virginia, and

Washington, D.C., including a location in Bethesda, Maryland.

3.      In or about May 2015, Lender EagleBank extended a $750,000 line of credit to

borrower DJB Holdings, LLC, with **BENNETT** as guarantor, with a loan date of May 19, 2015,

and a maturity date of May 19, 2016.  According to the Business Loan Agreement, dated May

19, 2015, and signed by **BENNETT**, DJB Holdings agreed to "[u]se all Loan proceeds solely for

Borrower's business operations, unless specifically consented to the contrary by Lender in

writing."  According to a Disbursement Request and Authorization, also dated May 19, 2015,

and also signed by **BENNETT**, the primary purpose of the loan was "business (including real

estate investment)."  The specific purpose of the loan was "short term working capital."

### The Scheme to Defraud

3.      Between at least in or about November 2014 and in or about July 2017, in the

District of Maryland and elsewhere, the defendant,

### DAWN J. BENNETT,

and others known and unknown to the Grand Jury, knowingly and intentionally executed, and

attempted to execute, a scheme and artifice to defraud EagleBank and to obtain money, funds,

and credits under the custody and control of EagleBank by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud").

### Manner and Means

4.    It was part of the scheme to defraud that, through fraudulent means, **BENNETT** obtained and attempted to obtain loans on behalf of DJB Holdings from financial institutions in order to repay DJ Bennett Investors and Lenders.

5.    It was further part of the scheme to defraud that **BENNETT** applied for and obtained a $750,000 line of credit from EagleBank on behalf of DJB Holdings, LLC.

6.    It was further part of the scheme to defraud that **BENNETT** made and caused to be made materially false and fraudulent representations to EagleBank in support of this loan application.  The materially false statements included, among other things, that **BENNETT** had a brokerage account with a net portfolio value of over $4 million, when, in fact, **BENNETT**'s brokerage account had a net portfolio value of approximately $35.

7.    It was further part of the scheme to defraud that **BENNETT** obtained money and property that was under the custody and control of EagleBank, including $250,000 on or around May 20, 2015, and $500,000 on or around May 27, 2015.

8.    It was further part of the scheme to defraud that, after the loan was approved, **BENNETT** deposited or caused to be deposited the loan proceeds into the EagleBank 2656 Account, which was controlled by **BENNETT**.  **BENNETT** then transferred or caused to be transferred significant portions of the loan proceeds into the FRB 2861 Account and the United 2054 Account.

9.      It was further part of the scheme to defraud that, after the loan proceeds were transferred into the FRB 2861 Account and the United 2054 Account, **BENNETT** used the money to repay DJ Bennett Investors and to pay **BENNETT**'s personal expenses.

10.     It was further part of the scheme to defraud that, after EagleBank declared the loan in default, **BENNETT** made further false representations to EagleBank as to why the loan had not been repaid, including that **BENNETT** had been overseas in China, when in fact she had not been in China.

## The Charge

11.     On or about May 19, 2015, in the District of Maryland and elsewhere, the defendant,

**DAWN J. BENNETT,**

did knowingly and intentionally execute and attempt to execute, and aid and abet the execution of, the scheme to defraud EagleBank by using false documentation to obtain a loan for DJB Holdings, LLC.


18 U.S.C. § 1344
18 U.S.C. § 2

## COUNT SEVENTEEN
### (False Statements on a Loan Application)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 8 of Count One and Paragraphs 2 through 10 of Count Sixteen of the Superseding Indictment are incorporated here.

### The Charge

2.      On or about April 27, 2015, in the District of Maryland and elsewhere, the defendant,

### DAWN J. BENNETT,

knowingly made and caused to be made, and aided and abetted the making of, false statements for the purpose of influencing in any way the actions of EagleBank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, that is, **BENNETT** made and caused to be made, and aided and abetted the making of, materially false statements regarding her assets in an email submitted to EagleBank for the purpose of securing a loan.

18 U.S.C. § 1014
18 U.S.C. § 2

### FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.          Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 981 and 982, and 28 U.S.C. § 2461(c), in the event of the defendants' convictions on Counts One through Seventeen of this Superseding Indictment.

### Securities Fraud Forfeiture

2.          As a result of the offense set forth in Counts One through Five, the defendants,

### DAWN J. BENNETT, and
### BRADLEY C. MASCHO,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, constituting or derived from, proceeds traceable to the violations.

3.          The property to be forfeited includes, but is not limited to, at least $14,169,754 in United States currency and all interest and proceeds traceable thereto, in that such sum, in aggregate, constitutes proceeds obtained, directly or indirectly, as a result of such violation.

### Wire Fraud Forfeiture

4.          As a result of the offenses set forth in Count Six, the defendants,

### DAWN J. BENNETT, and
### BRADLEY C. MASCHO,

shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), and 28 U.S.C. § 2461(c), any property, constituting or derived from, proceeds traceable to or obtained, directly or indirectly, as the result of such violations.

5.   As a result of the offenses set forth in Counts Seven through Fifteen, the defendant,

**DAWN J. BENNETT,**

shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), and

28 U.S.C. § 2461(c), any property, constituting or derived from, proceeds traceable to or

obtained, directly or indirectly, as the result of such violations.

6.   The property to be forfeited includes, but is not limited to, at least $14,169,754 in

United States currency and all interest and proceeds traceable thereto, in that such sum, in

aggregate, constitutes proceeds obtained, directly or indirectly, as a result of such violations.

### Bank Fraud Forfeiture

6.   As a result of the offense set forth in Count Sixteen, the defendant,

**DAWN J. BENNETT,**

shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A), any

property, constituting, or derived from, proceeds traceable to or obtained, directly or indirectly,

as the result of such violation.

7.   The property to be forfeited includes, but is not limited to, at least $750,000 in

United States currency and all interest and proceeds traceable thereto, in that such sum, in

aggregate, constitutes proceeds obtained, directly or indirectly, as a result of such violation.

### False Statements on Loan Application Forfeiture

8.   As a result of the offense set forth in Count Seventeen, the defendant,

**DAWN J. BENNETT,**

shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A) and

28 U.S.C. § 2461(c), any property, real or personal, which represents or is traceable to the gross

receipts obtained, directly or indirectly, from the offense.

9.      The property to be forfeited includes, but is not limited to, at least $750,000 in United States currency and all interest and proceeds traceable thereto, in that such sum, in aggregate, constitutes proceeds obtained, directly or indirectly, as a result of such violation.

**Substitute Assets**

10.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or,

      e.      has been commingled with other property which cannot be subdivided without difficulty;

the United States shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p), up to the value of the forfeitable property, that is, at least $14,169,754.

18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(2)(A)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

Stephen M. Schenning
Acting United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**

Foreperson

Date:      November 29, 2017