IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

- - - - - - - - - - - - - - x
                   :
UNITED STATES OF AMERICA,   :
                   :   Criminal No. 17-00472-PX
    v.             :
                   :
DAWN J. BENNETT,         :
                   :
       Defendant.    :   September 21, 2017
                   :
- - - - - - - - - - - - - - x  Greenbelt, Maryland

**BAIL REVIEW HEARING**

BEFORE:  THE MAGISTRATE JUDGE TIMOTHY J. SULLIVAN

APPEARANCES:           ERIN B. PULICE, Esq.
                    THOMAS P. WINDOM, Esq.
                    Office of the United State's Attorney
                    6500 Cherrywood Lane
                    Suite 400
                    Greenbelt, Maryland 20770
                      On Behalf of the Government

                    MARK E. SCHAMEL, Esq.
                    Wombie Carlyle Sandridge & Rice, PLLC
                    1200 19th Street NW
                    Suite 500
                    Washington, DC 20036
                      On Behalf of the Defendant

                    STEVEN GREMMINGER, Esq.
                    Gremminger Law Firm
                    5335 Wisconsin Avenue NW
                    Suite 440
                    Washington, DC 20015
                      On Behalf of the Defendant

Also Present:         James Ridgeway, Pre Trial Services
                    Keith Custer, Special Agent

Audio Operator:       Brandon Mottley

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

nm

Transcription Company:     CompuScribe
                           5100 Forbes Boulevard
                           Suite 101
                           Lanham, MD  20706
                           (301) 577-5882

nm                                                                      3

I N D E X

                                                                    Page

Preliminary Matters                                                    4

Comments by Thomas P. Windom, Esq.
    Attorney for the Government                                        9

Comments by Mark E. Schamel, Esq.
    Attorney for the Defendant                                        10

Comments by James Ridgeway
    Pretrial Services Officer                                         37

Comments by Judge Timothy J. Sullivan                                 76

Findings and Ruling by Judge Timothy J. Sullivan                      79

Motion for Steven Gremminger, Esq.
to withdraw from case:

Ruling by Judge Timothy J. Sullivan                                   82

Keynote: "---"indicates inaudible in the transcript.
          "*" indicates phonetically spelled in the transcript.

1                    P R O C E E D I N G S

2              (Whereupon, at 2:06 p.m., the proceeding began.)

3              THE CLERK:  Government, call the case, please.  Have

4    a seat.

5              MR. WINDOM:  Good afternoon, Your Honor.  We are

6    here on United States versus Dawn Bennett, PX-17-472 for

7    purposes of bail review hearing.

8              Thomas Windom and Erin Pulice for the United States.

9    With us at counsel table is Special Agent Keith Custer*.

10             MS. PULICE:  Good afternoon, Your Honor.

11             THE COURT:  All right.  Good afternoon to both of

12   you.

13             MR. GREMMINGER:  Your Honor, my name is Steve

14   Gremminger.  This is Dawn Bennett.  I have with me today

15   Mr. Schamel who has requested leave of court to enter a

16   special appearance and to appear on behalf of the Defendant

17   along with me.

18             THE COURT:  Sure.

19             MR. GREMMINGER:  And we request leave that he be

20   permitted to do so.

21             THE COURT:  Sure.  So let's talk about that first.

22   And as the parties know Judge Xinis sent me an attorney

23   inquiry referral today.

24             Counsel, you can come up.

25             MR. SCHAMEL:  Thank you, Your Honor.

1              MR. GREMMINGER:  Thank you.

2              THE COURT:  This is a real mess.  And, you know,

3    Ms. Bennett, you will find very quickly that I am not

4    Judge DiGirolamo.  And I am really unhappy.  And if I am

5    unhappy, you can assume that the district judge is unhappy.

6              We don't have like limited special super-duper

7    temporary maybe just -- maybe for a one minute hearing

8    attorney representations.  And we don't even have local

9    counsel in criminal cases.  Any attorney in the country can

10   come and represent a criminal defendant in this court.

11             So there is no such thing, Counsel -- you can have

12   seat.  There is no such thing as local counsel in a criminal

13   case.  And you can't hide behind the fact that you are local

14   counsel because once you are in, you are in.

15             We have one exception in this court, and it has been

16   the practice -- I was a criminal defense attorney for 26 years

17   in this building and in Baltimore before I became a magistrate

18   judge.  We dealt with the rule one, which we all know what

19   that is, if you show up at an initial appearance for a

20   criminal defendant, the court will give you the limited

21   ability to enter your appearance for that proceeding.

22             And then if you enter, then you are in.  And that

23   would allow the parties, the defendant, and the attorney to

24   figure out if they can resolve rule one, which we all know is

25   the ability to pay.  And the court is very flexible at that

1  point about either having another attorney inquiry hearing if

2  the defendant can't pay and may qualify for court appointed

3  counsel, or whether the defendant is going to shop around and

4  try to get retained counsel, counsel of choice, at that point.

5       But by my count -- by my count, there have been at

6  least four lawyers who have had some kind of -- there is a guy

7  in New Mexico, the guy in New York City, Mr. Morvillo* --

8  whatever his name is, you, and you.  So this case is like

9  brand spanking new and we are having trouble with

10 Ms. Bennett's attorneys and it is going to stop right now.

11      So I will let you participate today under this novel

12 downtown lawyer thing called -- whatever it is called.  I

13 never even heard of it before and I will probably spend a lot

14 of time trying to figure out exactly what to call it -- the

15 conditional limited appearance.  I am not even sure what that

16 means, but I have no intention of jamming up any lawyer.  And

17 I know the pain of getting in a case when the client can't pay

18 or won't pay.  And we are not going to -- I am never going to

19 force a defense attorney to stay in a case because it creates

20 all kinds of problems.

21      But the other side is I am never, ever, ever going

22 to allow a criminal defendant to manipulate, to use her

23 counsel of choice ability under the Sixth Amendment like a

24 carrousel to keep this case from moving forward.

25      So if I have to have attorney inquiry hearings every

1  other day, we are -- somebody is going to enter a full

2  appearance in this case to represent Ms. Bennett.  And we may

3  not have to -- we are going to get to it at some point today.

4  But for the purposes of where we are and what we are here

5  today for, which is a bail review hearing, I will let both of

6  counsel participate and protect the interests of Ms. Bennett.

7          But, Ms. Bennett, if you haven't figured this out

8  already, you got to hire a lawyer and that lawyer is going to

9  enter his or her appearance and that is it.  We are not going

10 to have this carrousel of four -- I mean, as -- the only thing

11 I agreed with your motion was that the -- you know, we have

12 had so many procedural irregularities in this case already and

13 it is brand new.

14         And that, I guess, is bad news that you guys got me.

15 But that is going to stop.  It is going to stop.

16         Ms. Bennett, you have got to lawyer-up one way or

17 the other.  You either hire a lawyer or you ask the Court to

18 consider appointment of counsel for you because you can't

19 afford counsel, or you represent yourself.  Those are the

20 three -- any criminal defendant has those three rights.

21         And we will talk more about a time table for you to

22 either, retain counsel and have that counsel enter his or her

23 appearance.  I don't want you without counsel.  That is why I

24 am keeping your lawyers in now; one who is already in who is

25 like shaking his head saying, "I don't know why I ever

1   answered that phone call."  And the other one who is trying to

2   -- I think based on the representations, trying to figure out

3   if a representation agreement can be reached with you.  And I

4   understand that takes time too, especially in cases like this.

5        But for the purposes of today, and today only, I

6   will allow both lawyers to participate in this hearing.  So

7   that is where we are for the attorney inquiry.

8        So let me run back some landscape on what I have

9   been able to catch up with.

10        MR. SCHAMEL:  Your Honor?

11        THE COURT:  I have listened to all the hearings in

12   front of Judge DiGirolamo and to my understanding, unless I am

13   missing something -- my understanding is we are here today for

14   a bail review hearing based on the August 29th, 2017

15   memorandum that Judge DiGirolamo -- from James Ridgeway, the

16   location monitoring specialist, in which Judge DiGirolamo was

17   notified of an apparent violation by Ms. Bennett for basically

18   -- like within hours of a hearing and without -- within hours

19   of trying to get installed on electronic monitoring based on

20   Judge DiGirolamo's conditions of release.

21        And in that memo he viewed the Defendant's non-

22   compliance as serious and respectfully recommended a prompt

23   bail review hearing.

24        In the interim, I am familiar with the fact that

25   Judge DiGirolamo modified a component of the release

1   conditions and had a hearing on September 14th about that

2   where counsel -- defense counsel participated by phone and

3   where the Government, I think, moved for detention at that

4   point and Judge DiGirolamo left the conditions of release as

5   he had imposed them and modified them.  And in a very

6   collegial-like way said, you know, Judge Sullivan can deal

7   with this.

8           So that is my understanding of why we are here.

9           Government, do you agree with that, not agree with

10  it?  Is there more nuance than that?  What is the --

11          MR. WINDOM:  That is why we are here.  The

12  Government investigated further after receiving the violation

13  notice from Pretrial.  We have additional evidence to present

14  to the Court involving Ms. Bennett's rampant, brazen

15  violations of the release order in this case.

16          So the Government would like to begin by asking

17  Pretrial if there is anything further to add to its report.

18          THE COURT:  Let me -- before we get down that road,

19  do you want to tell me that you are not prepared, that you

20  need time to prepare, that you are totally surprised by this,

21  that your client is prejudiced by this?

22          But I will then say to you, well, the gentleman on

23  the other side has been in this case, so you should be ready

24  to go today.

25          MR. SCHAMEL:  No, that is not what I was going to

 1    say, Your Honor.

 2              THE COURT:  Okay.

 3              MR. SCHAMEL:  Good morning, Your Honor.  Mark

 4    Schamel.

 5              THE COURT:  All right.  Good afternoon.  Hi.

 6              MR. SCHAMEL:  I am here for Ms. Bennett and I

 7    appreciate your -- first let me say, Your Honor, you are

 8    right.  The reason Your Honor doesn't know what that motion is

 9    is that is the, sort of, the machinations of my mind to try to

10    find a way to convey to the Court exactly what the Court took

11    from it.

12              I would be happy to go into more detail if Your

13    Honor would like at the bench.  Not *ex parte*, of course, with

14    the Government, if you want to know a little bit more about

15    it.

16              But I would like to, before we begin, Your Honor,

17    just -- I want Your Honor to be in the right frame of mind

18    before we start into the actual hearing because this is not

19    Ms. Bennett's doing.  The fact that Ms. Bennett is sitting

20    next to Mr. Gremminger and myself is not by her choice,

21    frankly.  She had lawyers.  She had lawyers for a significant

22    period of time.  This is a case that originated with an SEC

23    referral from Philadelphia that has been going on for well

24    over a year.

25              My understanding of what she has paid those two

1  individuals from New York to represent her is pretty

2  significant and what I would expect for a month's long trial

3  here in this district.  So the fact that she doesn't have

4  those lawyers at the last minute is not a gamesmanship by her

5  and I want Your Honor to know that.

6         THE COURT:  Okay.  That is fine.  I accept that.

7  Okay.

8         MR. SCHAMEL:  And as far as Mr. Gremminger, he --

9  with all due respect to Mr. Gremminger -- I have known him for

10 a number of years -- is a tax lawyer.  He is a former DOJ tax

11 lawyer.  He is not a criminal defense lawyer.

12         Apparently neither he nor the other gentlemen from

13 New York were aware of the issue on local counsel and had that

14 hearing.  So Mr. Gremminger -- when I talked to Mr. Gremminger

15 about this case -- when I saw his name and I talked to

16 Ms. Bennett about this case, I wanted to help.

17         So I just -- I want Your Honor to know this is not

18 gamesmanship.  It is exactly as you see from my

19 representations, --

20         THE COURT:  Yes.

21         MR. SCHAMEL:  -- is that I am trying to figure out

22 if I can get in.  The fact that all of the other lawyers in

23 this case have been subpoenaed for their billing records and

24 their engagement agreements has -- obviously, I have, you

25 know, traps that have to run at my firm about whether or not

1  that is something we are going to undertake.  So I was

2  comfortable having her here today and not letting

3  Mr. Gremminger be on his own for his first bail hearing.

4          THE COURT:  Right.  Look, I -- you know, I have no

5  information that Ms. Bennett is trying to game anything.  I am

6  just, you know, telling you and Ms. Bennett, given my

7  experiences, that we are not going to have a lot of back and

8  forth about attorneys.  And that this is the same for

9  Ms. Bennett, for any other criminal defendant.  You hire a

10 lawyer and let's get moving down the road.  It is that simple.

11         And, you know, nobody -- you know, look the Supreme

12 Court has made it known over, and over, and over, and over,

13 and over that the Sixth Amendment means something, and that a

14 person has the right to their counsel of choice.  And it is

15 not for me or the Government to interfere with that.

16         But when that pursuit of counsel of choice becomes

17 detrimental to the speedy resolution of a case and interferes

18 with the court's dockets, then it becomes a problem.  So that

19 was just the shot that I was shooting out.  I have no feelings

20 one way or another about what Ms. Bennett is doing or not

21 doing.  It is up to her.

22         MR. SCHAMEL:  And I didn't --

23         THE COURT:  Right.

24         MR. SCHAMEL:  -- wasn't inferring that Your Honor

25 did.

1            THE COURT:  Right.  Okay.

2            MR. SCHAMEL:  I just wanted to make sure that we

3   were clear that she has been dealing with me in good faith.

4   And frankly, thought -- I am her second choice.  She had

5   lawyers.  She thought those were going to be her lawyers.

6            THE COURT:  Right.

7            MR. SCHAMEL:  And they decided they wouldn't be.

8            THE COURT:  Right.  I understand.

9            MR. SCHAMEL:  So I am -- you know, I have known her

10  for 48 hours and --

11           THE COURT:  Right.

12           MR. SCHAMEL:  -- I am doing the best I can to --

13           THE COURT:  Okay.  All right.

14           MR. SCHAMEL:  -- sort of come up to speed.

15           THE COURT:  So we are --

16           MR. SCHAMEL:  On the issue of the hearing -- and I

17  know where Your Honor is going and I am not disagreeing that

18  this has been out there since the 29th of August.

19  Mr. Gremminger has never handled a criminal case.  That is not

20  the reason that he is not ready and I am not ready today.

21           The reason we are not ready, Your Honor, is we were

22  just -- and again, I haven't ever had a conversation with

23  either of these Government prosecutors until this morning when

24  they walked in.  And they have been very cordial and they were

25  very lovely, and they handed me a couple of spreadsheets right

1   after they served my client.  And Your Honor has them in front

2   of you as Government exhibits.

3        Right after the two FBI agents served my client with

4   a warrant in the back room to search her purse and take her

5   phone.  So they served the warrant on her, gave me the

6   spreadsheets and said there's 130, give or take, violations --

7   technical violations.  Here they are.  Alleged that she has

8   made phone calls from a number of phones that -- all news to

9   me, news to Mr. Gremminger.  Would not provide that to prior

10  counsel at any time for it.

11       If Your Honor looks at the multi-colored document

12  that is in front of you -- the multiple-page document that

13  lists those blue, red, yellow -- one of the phone calls there,

14  the yellow one, is actually Mr. Gremminger's phone.  This

15  gentleman right here.  This lawyer.  They are alleging that

16  Ms. Bennett made a call from Mr. Gremminger's phone to one of

17  the witnesses on the list.

18       They handed us that just now.  And in the five to

19  seven minutes before Your Honor took the bench, I had an

20  opportunity to call some numbers on there and actually talked

21  to one of people who is listed on that, and I would be happy

22  *ex parte* if Your Honor wants to know which person that was.

23  And that person told me that they did in fact talk to

24  Ms. Bennett.  I won't deny that that is what they said, but

25  that they have never, ever been asked and never been -- and

1  allow to register the fact that they want to continue talking

2  to her.  They are not -- that person is not a victim, was

3  never defrauded from anything, has ongoing business concerns

4  with Ms. Bennett, should not be on a list of not being able to

5  talk to her.

6          And contrary to what the Government Counsel, I

7  think, is going to argue, was not -- it was not an intent to

8  influence this person, there no intent to obstruct or tell

9  this person not to testify truthfully or to falsify things.

10 Nothing on tort.  One person, one call, five minutes that I

11 have had this document.

12          So the Government is going to get up here and they

13 are going to -- and I read the report from August 29th, which

14 is the same report that His Honor -- Judge DiGirolamo had in

15 front of him when this was punted.  The Government is going to

16 get up here -- I talked -- I had a chance to talk to

17 Mr. Ridgeway too who thinks that she needs to be held -- and

18 they are going to ask that this woman with no criminal record

19 be held because she has been allegedly making these phone

20 calls they wouldn't disclose to use, the last phone call being

21 the 3rd of September; okay?  So three weeks ago.

22          Reasons we are are playing, you know, this sort of

23 got you game where we are coming into the courtroom and we are

24 doing trial by ambush, I don't know.  Maybe it is because when

25 I start calling these people they are going to disagree with

1   what the Government's representations are, I don't know.

2            But I know that we -- Mr. Gremminger and I -- just

3   received this before you walked into the courtroom.  And I

4   make one call, talked to one witness, and it directly

5   contradicts what the Government said that the proffer would

6   be.

7            Secondly, Your Honor, the Government previously

8   asked for a continuous on this.  They asked for a continuous

9   on the 14th of September.  I am not sure -- and I get we have

10  got to have the hearing, and I get she has got to have a

11  lawyer, and it has to be done -- I am not sure what has

12  changed from the 14th of September until the 21st of September

13  when the last phone call or allegation here is on the 3rd of

14  September, and the Pretrial allegation is the end of August.

15           So I am not really sure what the rush is on it.  And

16  if there is a rush -- right?  If there is a rush and these are

17  technical violations, to have her held when I was just

18  informed by Government Counsel that they both have trials

19  every single month from now until the beginning of next summer

20  and that the judge who is assigned to this case is setting

21  trial dates in July -- this is a bank fraud/wire fraud case.

22           We know that they have got an ongoing grand jury.

23  They have confirmed for us that they intend to supersede

24  before the end of the year.  So we will have a superseding

25  indictment before the end of the year.  Maybe it looks more

1    like the complaint that they filed before they filed the

2    indictment.  I don't know because I just don't know the case

3    well enough.  Maybe that is what it looks like and maybe we

4    are not looking at a single count of bank fraud for a $750,000

5    loan that has been repaid.  Maybe that there is actually

6    something there, there.

7            But at his junction, I am just not quite sure what

8    the all fire hurry is to put this woman in a cage until next

9    summer so that they can supersede, other than they want to

10   punish her for these alleged violations.

11           What I would like to do, if given by druthers, is

12   have an opportunity to actually run some of this down, talk to

13   some of these people, and see what is there, number one.  Find

14   out, if in fact, they can prove -- and I am sure they can with

15   just the testimony of Agent Custer by probable cause -- that

16   there were technical violations of the stay-away -- or the no-

17   contact -- the no-fly list, sort to speak.

18           My question is -- and again, I was not involved in

19   this case in New Mexico.  There was some other lawyer Your

20   Honor referenced that stood in as local counsel because she

21   now lives at a ranch in New Mexico -- I don't know what the

22   showing was.  What showing was made in New Mexico that these

23   35 plus individuals should be on a no-contact list?

24           If Your Honor looks at the actual order, she is

25   allowed to keep working.  She has an ongoing concern in which

1    she has invested millions of her own dollars into.  There are

2    a number of investors who have been in contact with lawyers --

3    which is actually how I got contacted on this case -- to

4    believe that what she is doing is legitimate, that there was

5    no fraud here, they are being misrepresented, they don't want

6    to have a no-contact with her.

7              So I understand that the Government can get up and

8    they can say -- and let's just assume for the sake of today's

9    discussion that they can easily prove these technical

10   violations that she made phone calls to individuals that were

11   listed on that list.  I think we have an obligation -- and I

12   am not casting these versions on the lawyers before, the

13   judges before, or the Government in New Mexico, but we have an

14   obligation because it is here in front of us today to actually

15   look at it and decide do these people belong on a no-contact

16   list?  Right?  Do these people belong on a no-contact list?

17             THE COURT:  So why is that my -- why is that my job?

18   Why isn't it -- if I accept the Government's proffer that

19   Ms. Bennett may be engaging in obstruction of justice by

20   talking to people who are investors or whoever, and I tell

21   her, look, one of the conditions of release is you can't have

22   contact with all of these people, why is it that is solely my

23   call as the magistrate judge setting conditions of release?

24   And why do you want to have -- and why would I ever let you

25   have a mini hearing where we sit here for hours and hours and

1   talk about why Tim Sullivan wants to talk to Dawn Bennett and,

2   you know, why -- and so I think you are putting it backwards.

3   It is really not whether somebody on the no-contact list wants

4   to talk to Ms. Bennett, it is Ms. Bennett's restriction on

5   talking to them, isn't it?  Isn't that the more appropriate --

6           MR. SCHAMEL:  You are right, Your Honor.  That is

7   the appropriate analysis.  The question here though and what

8   it doesn't appear to have happened, is that analysis has ever

9   occurred, why she was not permitted to talk to those people?

10  Because Your Honor knows.  You have tried cases as a defense

11  lawyer 26 years.  The Government doesn't just get to come in

12  and say, no, Ms. Bennett, you can't talk to people you have

13  known 30 and 40 years while we investigate you and prosecute

14  you.  There has to be some showing.

15          THE COURT:  Right.

16          MR. SCHAMEL:  And there is no record here that --

17          THE COURT:  And I don't -- you know, based on what

18  -- the only -- and, again, Mr. Windom can -- and I don't want

19  to get too far ahead of all this, but, you know, I have never

20  seen the list, I don't -- the only thing I was able to track

21  was the list was presented at the Rule 5 out in the District

22  of New Mexico.  And then Judge DiGirolamo at the initial here

23  adopted that list that was presented to your client, or your

24  limited conditional client, at the initial appearance in New

25  Mexico.

1    And I have never seen the list and I don't think

2  Judge DiGirolamo has ever seen the list.  I think he just

3  incorporated based on the Government's request that that list

4  be incorporated into his release conditions, which is, as you

5  know, a routine condition of release that you can't talk to

6  witnesses, or codefendants, or people who are involved in the

7  case to protect, really, the Defendant from allegations of

8  obstruction, or witness tampering, or -- so it is a protection

9  for both sides, both for the defendant, so he or she doesn't

10  engage in conduct that could be mischaracterized by the

11  Government as obstruction and/or witness tampering.

12    And it also protects witnesses and victims from

13  being harassed by somebody who has been charged with a crime.

14  So it is kind of a two-fold thing.

15    So I hear what you are saying.  Let me --

16  Mr. Windom, let me just ask -- go ahead.

17    MR. SCHAMEL:  May I say one last thing before I sit?

18    THE COURT:  Yes, one other thing.  Go ahead.

19    MR. SCHAMEL:  I agree, Your Honor.  I think your

20  analysis is correct.  Therein lies the problem, which is this

21  -- and I am -- again, I am trying to be very careful here

22  because I don't -- I am not even alleging anything improper by

23  the Government; right?  I mean, they have their position.

24  They raised it.

25    Where the failure seems to have been is up until

1   this moment, right now when I am standing before Your Honor,

2   this conversation has never occurred.  Whoever this person, he

3   or she, in New Mexico who stood in as sort of the ceremonial

4   lawyer for that particular hearing, did not raise this issue,

5   there was no inquiry, there was no pushback, there was no

6   anything, so the judge just signed this mystery list of

7   individuals.

8           Then it comes here and nobody raises it so -- it is

9   not Judge DiGirolamo's job to raise that *sua sponte* --

10          THE COURT:  Right.

11          MR. SCHAMEL:  -- so nobody raises it.  But she is

12  allowed to keep working and some of these people -- and I --

13  with restrictions understandably -- some of these people --

14  most of these people are people she has had relationships --

15  ongoing relationships for 30 plus years.  And so she is under

16  indictment.  These are her closest friends.  And if she -- if

17  there are technical violations, there are technical

18  violations.  But to have conversations -- why are some of

19  these people on the list?  Particularly when the one person I

20  have even talked to in the last -- well, now it is about 20

21  minutes -- said they had no interest in being on that list in

22  the first place.

23          THE COURT:  Yes, but it is not their call; right?

24          MR. SCHAMEL:  No, it is not.  But we need to have at

25  least -- if the Government comes up and says she can't talk to

1  Joe Blow; right?  And I say, okay -- Joe Blow is an investor.

2  And Joe Blow comes to me and says, I have been her best friend

3  since we went to kindergarten together.  We talk all the time.

4  We don't want to talk about the case.  We are not going to

5  talk about the case, but we go to church together every

6  Sunday, we have our holidays together, I sometimes stay in her

7  house when I'm visiting.  But we are not going to talk about

8  the case.  We make those concessions all the time in cases.

9  We have family members that are co-defendants, they are

10  allowed to talk to each other.  They are not allowed to talk

11  about the case.

12           THE COURT:  I can't help, but early on in my

13  judicial career I actually ordered a wife not to have any

14  communication with her husband.  They were both co-defendants.

15  And the husband said to me at a hearing, --

16           MR. SCHAMEL:  That is fine.

17           THE COURT:  -- Thank you very much.

18           MR. SCHAMEL:  (Laughter.)

19           MR. WINDOM:  (Laughter.)

20           THE COURT:  So, you know -- but I appreciate that.

21  I mean, and I get it.  I get it.  But I also -- I hear you and

22  I understand.

23           MR. SCHAMEL:  Yes.

24           THE COURT:  I understand that.

25           MR. SCHAMEL:  And that is -- and obviously, I am

1   putting a little bit -- putting the cart before the horse and

2   I am not trying to get out too far in front of this and say,

3   okay, everybody on that list she should be able to talk to and

4   so if she violated it doesn't matter, no harm, no foul.

5                THE COURT:  Right.

6                MR. SCHAMEL:  That is not the argument I am making.

7                What I am saying is there hasn't been a careful

8   analysis of the people that are on that list.  If there had

9   been violations, that there have been phone calls between now

10  and the 3rd of September, I would assume that we are going to

11  see that in the superseding indictment, there are going to be

12  obstruction charges.  She is going to have to live with that.

13               But the question for us is; A, am I prepared?  And

14  B, can I properly make the argument to Your Honor that she is

15  not a flight risk as she sits here, again, in court?  And

16  having had the GPS monitoring taken off on her -- and are

17  there a condition or conditions that will assure the safety of

18  the community from even financial harm?

19               THE COURT:  Right.

20               MR. SCHAMEL:  But I will sit here.

21               THE COURT:  All right.

22               So, Mr. Windom, before you say whatever you wish to

23  say, but could you kind of follow then to your comments --

24  isn't it somewhat colorable -- no pun intended on the chart

25  here which is all color coded -- but isn't it kind of unfair

1  to have these kinds of technical exhibits with numbers, and

2  dates, and people, and not share them for whatever

3  prosecutorial reason with counsel for Ms. Bennett, and then

4  come in and say we are moving for detention and this is why we

5  are moving for detention and not having allowed limited

6  conditional defense counsel or civil lawyer who is not stuck

7  in a very complicated criminal case, the opportunity to

8  prepare for the hearing and, at least, you know, look at this

9  -- look at these documents before the Government shows them to

10 me and moves for taking away her liberty and detaining her

11 based on that conduct and they don't have an opportunity to

12 really review this?

13          MR. WINDOM:  I will give you my answer and I will

14 give you a resolution.  The answer is no, it is not unfair.

15 This happens every single day in this courthouse at regular

16 initial detention hearings when somebody is arrested.  The

17 lawyers are brought into the case five minutes before -- not

18 48 hours before -- and told, okay, we are having a detention

19 hearing.  Judge Day might have it today.  Judge Collier* or

20 yourself my set it off a few days.  But they are routinely

21 handled the same day as the defendant is arrested, presented

22 with whatever they are presented with at the hearing.  So it

23 is not unfair.

24          An additional fact attenuating the situation here,

25 last week Ms. Bennett was supposed to appear in this

1    courthouse.  Her lawyer at the time, Jen* Negolia* -- I

2    believe was the one at the time -- told her she didn't have to

3    come.

4              THE COURT:  Yes, I heard that.  Yes.  Yes.

5              MR. WINDOM:  We were going to execute -- it was

6    Morvillo last week?

7              THE COURT:  It was Gregory Morvillo.

8              MR. WINDOM:  It was Greg Morvillo last week by

9    phone.  I am sorry.  I am getting them confused as well.

10              THE COURT:  That is okay.  There has been so many

11   lawyers.  I understand that.  I can understand.

12              MR. WINDOM:  He told her she didn't have to show up.

13   We were going to execute the warrant.

14              MR. GREMMINGER:  It wasn't me, Your Honor.  I had --

15              THE COURT:  No, I know, it wasn't you.

16              MR. GREMMINGER:  Okay.

17              MR. WINDOM:  We were going to execute the search

18   warrant that we executed on her today last week.  The search

19   warrant was to obtain the cell phones that she was using to

20   violate the court order.  The intention was always after we

21   executed the search warrant to show the information that we

22   have to defense counsel.  It was defense counsel's choice last

23   week to tell their client not to come to the courthouse.  We

24   were unable to execute the warrant.  We effected that warrant

25   today.  I immediately handed -- less than 30 seconds later --

1    the information that Defense Counsel now has and -- this in

2    front of Your Honor -- to them.

3            We could not risk giving it to them beforehand

4    because since she already has violated the court order,

5    purchased a burner phone, made many calls on that.  We believe

6    that she would destroy evidence if her defense counsel were in

7    possession of the information that we are using to seek

8    detention.  We could not do that beforehand.

9            The resolution I promised is this:  They want to

10   have time to review this?  No problem.  We will sign a -- if

11   they want to sign a voluntary detention order today we can

12   come back their election.

13           THE COURT:  All right.  Let me ask you this, what if

14   I said to all of you, you know what?  What is really before me

15   today is the notice of apparent violation and let's deal with

16   that today.  And then come back tomorrow because -- you know,

17   the cynicism that a former criminal defense attorney has to

18   the complexity of the review process I kind of know.  And I am

19   not sure that, you know, the issue is written large here.  I

20   am not going to engage, at least at this point, in time with

21   like going through each of these people and getting their CVs

22   and finding out that they have some social interaction with

23   Ms. Bennett.  I am not interested in that.  And that issue is

24   -- you know, when I hear things like burner phones and things

25   like that, obviously, that creates some interest in my mind.

1              But let me ask Mr. Schamel.

2              What do you think about the Government's proposal?

3              MR. SCHAMEL:  Sign a voluntary detention order?

4              THE COURT:  Uh-huh.

5              MR. SCHAMEL:  I think that I would be the worst

6    temporary, sort of, for the day, lawyer, in the history of

7    this courthouse probably.

8              THE COURT:  Okay.  So you are ready to go forward

9    today?

10             MR. SCHAMEL:  No.  I think, Your Honor, I have

11   articulated a number of reasons on the record why, I think,

12   that we -- I think Your Honor, frankly, is right.  I don't

13   think we have the proper notice to be here for these new

14   violations.  I mean, we have -- as Your Honor said when you

15   sat down, August 29th we have a violation when she was --

16             THE COURT:  Right.  So let me just -- let me just

17   cut to the chase here.

18             MR. SCHAMEL:  Sure.

19             THE COURT:  What would happen just -- and I know

20   judges aren't supposed to give advisory opinions, but this

21   isn't an advisory opinion.  You don't know me.  I don't know

22   you.  Ms. Bennett doesn't know me.  But I have a far different

23   view of release conditions than, perhaps, some of my

24   colleagues do.  And my philosophy is pretty simple.  That I

25   give you release conditions and we make a contract, you will

1   follow them and I will let you out.  If you don't follow them,

2   I will put in detention.  That is basically my philosophy.

3           So we go back to the allegations on August 29th with

4   Ms. Bennett telling Pretrial that somehow she is so bewildered

5   by what has happened to her that she can't find her way back

6   to Chevy Chase when she is ordered to go directly home, and

7   that the Defendant explained that she believed she was

8   experiencing stress from the day's events and kept taking

9   wrong turns to her home.

10          And Pretrial then is irritated because they told her

11  expressly, Go right home and we will meet you there.  And in

12  -- within hours of being put on release conditions -- not

13  getting -- forget about the no-contact -- or forget about

14  this.  I will turn this over.  I won't look at this.  But

15  forget about this.  Let's talk about the August 29th.  Within

16  hours of being put on release conditions she is not following

17  her instructions.

18          And you know, and I know under 3148, if I make a

19  finding that she is unable or unwilling to abide by conditions

20  of release, then I can do other things.  But, you know, why

21  can't we just talk about the August 29th?  And then I will

22  make a decision as to whether conditions of release are

23  appropriate, or whether she should be detained.  And at that

24  point the Government can say whatever they want about all

25  these calls and what they view as her obstructive conduct.

1    And we can set this in for another hearing tomorrow or -- what

2    is today?  Today is Wednesday?

3              MR. WINDOM:  Thursday.

4              THE COURT:  Thursday.  And we can set it in for

5    another hearing tomorrow after you have had an opportunity to

6    -- and you are with a big firm; right?  You are with -- or who

7    are you with?  Womble?

8              MR. SCHAMEL:  Womble Carlyle.

9              THE COURT:  Yes.  They got tons of lawyers so you

10   can like work this thing up overnight and just --

11             MR. SCHAMEL:  (Laugher.)

12             THE COURT:  -- and with all your associates and

13   everything else and be fully ready with your defense team

14   tomorrow and enter your full appearance to represent her and

15   we don't have to worry about this conditional limited

16   representation.

17             So why don't we move forward with the hearing today?

18   Well, we are going to move forward with the hearing today,

19   talking primarily about the notice of apparent violation on

20   the 29th.  And if the Government believes that they want to

21   bring additional information to my attention, we will -- I

22   will listen to that as well.

23             But we are not going to -- everybody is on notice at

24   least minimally that we are here for the August 29th memo,

25   which Pretrial says within hours Ms. Bennett's supervision is

 1 │ poor and they want a prompt bail review hearing.

 2 │            And Mr. Ridgeway is here.  And I am going to hear

 3 │ from him about what is going on and how supervision has been.

 4 │ And I think that is a more logical way to approach this.

 5 │            MR. SCHAMEL:  I think that is completely fine, Your

 6 │ Honor.

 7 │            THE COURT:  Okay.

 8 │            MR. SCHAMEL:  That makes a lot of sense.  And I

 9 │ think -- may I address the question you proffered to me about

10 │ -- I think you asked me sort of -- or maybe it was rhetorical

11 │ -- about so this is the way you see things and this is the how

12 │ you do.  And candidly I wish you had been the judge at the

13 │ first hearing and I had been the lawyer at the first hearing

14 │ and there wouldn't be a need for this hearing because --

15 │            THE COURT:  Be careful what you ask for.

16 │            MR. SCHAMEL:  No, actually I get a sense, Your

17 │ Honor, that you and I are sort of the same ilk on these

18 │ things.  I don't play in the grey on these.

19 │            THE COURT:  Right.

20 │            MR. SCHAMEL:  You know, my view is if we are in

21 │ court and we are making excuses for why I did something, we

22 │ have already done something wrong.

23 │            THE COURT:  Okay.

24 │            MR. SCHAMEL:  So I hear you on the 29th.  I mean, I

25 │ am -- I used some colorful language that my mother is not very

1   proud of when I talk to my clients about what the rules are,

2   what they have to do when we follow court.  And I think Your

3   Honor would have been probably -- and I don't have the benefit

4   of having heard the court reporter's version of what happened

5   last time, but it would have been pretty clear and I think I

6   would have been equally clear.

7            By the same token though, I mean -- and this is why

8   I think it is important what I am saying, she didn't come to

9   the last court appearance.  A lawyer -- whichever lawyer it

10  was --

11           THE COURT:  Yes, let me just put -- let me just --

12           MR. SCHAMEL:  Right.

13           THE COURT:  I listened to that.  It is incredible

14  risk for an attorney to make a decision to tell his or her

15  client not to come to a court appearance.  Judge DiGirolamo

16  handled it the way Judge DiGirolamo chose to handle it.

17           Would I have been as accommodating?  No.  But that

18  is water under the bridge.  And, you know -- but it is a fair

19  argument that whether she didn't come because the lawyer told

20  her not to come or she didn't come because she didn't feel

21  like she wanted to be bothered with coming -- I mean, those

22  are -- that is a fair inference that both parties can argue.

23  But I am not going to hold -- you know, there is -- I am not

24  going to put any weight at all into Ms. Bennett's not being

25  physically present at the September 14th hearing before Judge

1  DiGirolamo.  That has got no weight.  I am not considering.

2  It has been raised, but I am not considering that in any way.

3           MR. SCHAMEL:  I didn't suggest you were, Your Honor.

4           THE COURT:  Right.

5           MR. SCHAMEL:  The reason I was bringing it up was

6  context because I think we have to -- again, context is

7  important.  And this is why the Procedural Rules say, when

8  possible, the judge who issued the order is supposed to be the

9  judge who does the hearing.

10          THE COURT:  I am not sure it says that.  I am not

11  sure it says that.  It says if there is a commission of a new

12  crime; right?

13          MR. SCHAMEL:  I will have to look back at 3148,

14  but --

15          THE COURT:  Well, go ahead.  Go ahead.  But let me

16  put it this say, let's nip this in the bud too, I got a

17  referral -- I got a --

18          MR. SCHAMEL:  I have no problem with Your Honor

19  doing it.  I am not raising that as a --

20          THE COURT:  No.  No.  I mean, we are not going back

21  to Judge DiGirolamo and --

22          MR. SCHAMEL:  And I am not suggesting that we were.

23          THE COURT:  And he set it in for me and I now have

24  the referral from Judge Xinis on the attorney inquiry --

25          MR. SCHAMEL:  Correct.

 1              THE COURT:  -- which is a broad spectrum medication.

 2   And, you know, you and I -- if you are no longer the limited

 3   conditional attorney, you know, you are going to be

 4   inextricably intertwined with me as we move through all these

 5   preliminary things.

 6              So it is not going -- I hear what you are saying.

 7   It is not going back to Judge DiGirolamo.  It is, you know --

 8              MR. SCHAMEL:  And I wasn't asking for that, Your

 9   Honor.  I am just saying, we are -- you and I are both coming

10   at this with fresh eyes not having been there.

11              THE COURT:  Sure.  Right.

12              MR. SCHAMEL:  And the manner -- and I will say this

13   -- I am always reluctant on the record to say things that

14   sounds like I am throwing someone under the bus -- but the

15   loosey goosey manner in which representations were made on

16   Ms. Bennett's behalf prior to today, make me inherently

17   uncomfortable.  The fact that any lawyer would tell their

18   client in any circumstance in a criminal case not to come to

19   court is completely beyond the realm of understanding.  I do

20   not have any idea why anybody would say that.

21              When I tell my clients to come to court they come an

22   hour early.  We checked in with Your Honor's courtroom deputy,

23   Reggie, at ten minutes after one as soon as your -- whatever

24   time Your Honor got off the bench from your prior hearing.  We

25   are here early.  We are here promptly always, unless I have

1   something in writing saying otherwise.

2            So what I am trying to -- the point I am trying to

3   make is, when an order is issued to my client to go directly

4   home, before we walk out of the courtroom I turn to my client

5   and say, Do you have to pick up your kids?  Do you have gas in

6   your car -- to stop for gas?  And then if they have to and

7   say, Look, I got no gas, or I didn't get ride here, I have to

8   wait to get picked up, I go back on the record and I put it on

9   the record in front of the court and say, Your Honor, my

10  client can't go directly home.  She has to pick up her child.

11           I am not saying Ms. Bennett has a child, but -- and

12  take those kinds of precautions to avoid exactly this kind of

13  problem.  And what I am trying to ask Your Honor is to put

14  yourself in the situation of we don't know what those

15  conversations were and we don't know that she was given that

16  sort of scared straight talk that Your Honor has already

17  started giving that I have been giving for the 48 hours I have

18  known Ms. Bennett.

19           So I just -- I want, contextually, Your Honor to

20  understand it is -- it sounds so cheesy to say it -- we have a

21  new sheriff.  This is a new situation.  I don't practice the

22  way it appears that they have practiced over the last couple

23  of weeks.

24           THE COURT:  Right.  But what if I never see you

25  again?  I mean, I will probably cry, but what if I never see

1   you again?  I mean, what if your conditional limited position

2   in the court, and all of how you practice law, and, you know

3   -- I know who you are and you have a great reputation.  But,

4   you know, what if I never see you again?  And -- because you

5   couldn't work out with Ms. Bennett the logistics of your

6   representation as counsel of choice?  And then you disappear.

7   And then, Hi, Mr. Gremminger.

8              MR. SCHAMEL:  (Laughter.)

9              THE COURT:  So, you know, what are we -- I hear what

10  you are saying.  Let me just let Mr. Windom say something.

11             MR. SCHAMEL:  Yes, Your Honor.

12             THE COURT:  But let me just say just to answer again

13  to kind of tamp down some things if we can.  My reading of

14  3148 says this, "To the extent practicable, a person charged

15  with violating the condition of release that such person no

16  commit a Federal, State, or local crime during the period of

17  release, shall be brought before the judicial officer who

18  ordered the release and whose order is alleged to have been

19  violated."

20             So the culture in this court also is that, you know,

21  whoever pulls duty and gets it, gets it.  And that is why I

22  got it.  So, you know --

23             MR. WINDOM:  I can speak on that, actually, please.

24             When we -- when the parties mutually requested that

25  the detention hearing be pushed, the parties talked about what

1    dates worked for them.  One of them was in New York.  I can't

2    just walk into the courthouse on any given day.

3           That defense counsel and Government counsel were

4    available today, as it turns out.  When we called chambers and

5    said, Hey -- Judge DiGirolamo's chambers -- and said, Hey,

6    let's set it in.  They said, Sure, not a problem.  Oh, Judge

7    Sullivan is on the bench that day.  It works for you all, but

8    Judge Sullivan is going to be hearing it.

9           So that is -- as a practical matter, why we are here

10   today before you.  There is absolutely no legal bar to have

11   any judicial officer in this district hearing this.

12           THE COURT:  Right.

13           MR. SCHAMEL:  Agreed.  And I was trying to make a

14   representation -- if I did it awkwardly and unartfully, let me

15   clear up the record for Your Honor.  I am not suggesting that

16   Your Honor is not judicially appropriate to hear this.  I am

17   not suggesting in any way that it shouldn't be before Your

18   Honor or I am not asking Your Honor to send it back to Judge

19   DiGirolamo.

20           What I am suggesting is you weren't here, I wasn't

21   here.  So I am always reluctant to go too far down the pike of

22   how it should have been assuming that we did it the right way.

23           THE COURT:  Right.

24           MR. SCHAMEL:  And given the fact that this young

25   woman was told not to come back to court, and her lawyer has

1    confirmed that, that tells me it is a sort of loosey goosey --

2            THE COURT:  Right.

3            MR. SCHAMEL:  -- attitude that is not really in line

4    with the way it should be handled.

5            THE COURT:  All right.  I understand.  All right.

6            So, Ridgeway --

7            MR. RIDGEWAY:  Yes.

8            THE COURT:  -- let me -- let's start talking about

9    the -- and I understand what everybody is says and I will take

10   into consideration as how we proceed.

11           But, Mr. Ridgeway, good afternoon.

12           MR. RIDGEWAY:  Good afternoon.

13           THE COURT:  So I have read -- and, I guess,

14   Mr. Windom, you have -- and Ms. Pulice have reviewed the

15   August 29th memo; correct?

16           Mr. Windom?  Hello?

17           MR. WINDOM:  Yes, sir.  I am sorry.

18           THE COURT:  Okay.  And you have reviewed the August

19   29th memo?

20           MR. WINDOM:  yes.

21           THE COURT:  All right.  And, counsel, both of you

22   have reviewed the memo as well?

23           MR. SCHAMEL:  Mr. Ridgeway was kind enough to give

24   me one today and I have had a chance review it.

25           THE COURT:  Right.  Okay.  All right.

1              MR. SCHAMEL:  Thank you, Your Honor.

2              THE COURT:  So, Mr. Ridgeway, why don't you tell me

3     -- I mean, I read what you say happened hours after her placed

4     -- being placed on conditions of release from

5     Judge DiGirolamo.  So why don't you tell me whatever it is

6     that you want to tell me.  And include in your comments to me

7     how conditions of release are progressing since she has been

8     placed on release conditions, and including as how they have

9     been modified.

10             MR. RIDGEWAY:  Okay.  Your Honor, first of all I

11    want preface this by saying that at the August 28th initial

12    appearance before Judge DiGirolamo I wasn't there for that

13    hearing.  But our office did make -- upon hearing the

14    additional --- by the Government, we did make a recommendation

15    to be detention in this case based on flight and danger in

16    this case.

17             So we are coming from that position as -- and then

18    Judge DiGirolamo ordered Ms. Bennett released on the very

19    strict conditions to include location monitoring.

20             As Your Honor knows, you know, when someone is

21    placed on location monitoring, it is the most restrictive form

22    of supervision that we provide the court.  And it is expected

23    that that defendant abide by all those conditions.  And the

24    instructions are from our office.

25             As noted in my report here, you know, there -- it

 1  didn't happen that way.  Ms. Bennett, she was instructed to go

 2  back home.  I --

 3            THE COURT:  Did you instruct her or did somebody

 4  else?

 5            MR. RIDGEWAY:  I did.

 6            THE COURT:  Okay.

 7            MR. RIDGEWAY:  Yes, I met -- yes, I -- so I wasn't

 8  here for the hearing, but I was -- I --

 9            THE COURT:  Right.  So they had the regular --

10  somebody else, whoever covers the writers were here then.

11            MR. RIDGEWAY:  Correct.

12            THE COURT:  She went down to Pretrial and got

13  assigned to you as electronic supervisor or whatever it is.

14            MR. RIDGEWAY:  Yes, Your Honor.  Yes.  So we went

15  through the whole thing and I made very clear to her -- gave

16  it to her in verbal instructions and written instructions

17  letting her know that she needs to go straight back home, make

18  no additional stops.  And I was going to meet her back at her

19  residence to install her on location monitoring equipment.

20            I got -- she left our courthouse around three

21  o'clock.  And, you know, I got to the -- her residence -- I

22  left -- you know, I stuck around the office for a while.  And

23  still got there at, I think, around four o'clock, Your Honor.

24            But as my report here indicates, she didn't call me

25  until -- and let me know that she was actually at the

1    residence until 5:13 p.m.  So --

2              THE COURT:  So --

3              MR. RIDGEWAY:  So we are talking about over two

4    hours to get back home.

5              THE COURT:  So where -- just so the record reflects,

6    where was -- she was supposed to go straight home from the

7    Greenbelt courthouse to where is straight home?  Where was

8    that?

9              MR. RIDGEWAY:  In Chevy Chase, Maryland.

10             THE COURT:  Okay.

11             MR. RIDGEWAY:  So from here to the courthouse.

12             THE COURT:  All right.

13             MR. RIDGEWAY:  So --

14             THE COURT:  So the beltway to Connecticut Avenue or

15   the beltway to Wisconsin or wherever Chevy Chase --

16             MR. RIDGEWAY:  Yes.  Correct.

17             THE COURT:  Wherever -- okay.

18             MR. RIDGEWAY:  And I didn't have much difficulty

19   getting there on that date.  There wasn't any excessive

20   traffic getting to the location.

21             It wasn't about that.  As I note here in this

22   report, according to Ms. Bennett she says that she got -- kept

23   on getting lost.  She kept on taking wrong turns in getting to

24   the residence.

25             But I will note that --

1              THE COURT:  So from Greenbelt to Chevy Chase, where

2    she lives, she told you that she was making wrong turns.  That

3    is why she wasn't there when she was supposed to be there?

4              MR. RIDGEWAY:  Correct.  Yes.

5              THE COURT:  Okay.

6              MR. RIDGEWAY:  But, you know, I think the other

7    thing that is important to note is that during this time --

8    because I arrived there well before she did -- I had left

9    before she got there because I -- at that point I hadn't had

10   with her.  When I first got to her residence I only met with

11   her assistant after finally getting into the residence.  It is

12   a gated residence.  But after I finally spoke with the

13   assistant he tried to make contact with her.  I had also made

14   contact with her attorney to what her attorney noted that she

15   wasn't here.

16             THE COURT:  Which attorney?

17             MR. RIDGEWAY:  I --

18             THE COURT:  Him?  Mr. -- okay.

19             MR. RIDGEWAY:  Yes.  I believe so.

20             THE COURT:  All right.

21             MR. RIDGEWAY:  And so I let him know that, you know,

22   there was an issue.  I mean, at this point, Your Honor, as you

23   probably can grasp, that I was probably thinking that

24   Ms. Bennett had, you know, absconded at that point.

25             So I left the residence with the mind that I was

1   going to be coming back to the office to draft a request for a

2   warrant.  On the way back to the office she finally called me.

3   And, again, Your Honor, if I haven't said so already, I was

4   making -- you know, I had been making calls to her, I made the

5   call to her attorney.  She finally calls me back and it wasn't

6   until, as the report indicates -- at 5:13 is when she actually

7   got back into the residence.  And then I did ultimately go

8   back to the residence and ultimately installed her on the

9   location monitoring equipment that day.

10           Your Honor, that is not the way it is supposed to

11  happen at all.  And I find it difficult to believe that

12  Ms. Bennett wasn't able to answer my calls.  You know, if --

13  again, I know she indicates that she was getting lost, went

14  the wrong way on the beltway, but why she also didn't respond

15  to my calls -- my numerous calls to her cell phone is another

16  question I have.  I don't think was answered.

17           THE COURT:  So approximately about how many calls

18  did you make to her that she didn't pick up on, if you recall?

19  Did you keep a log of that?  Or just if you can estimate for

20  me.

21           MR. RIDGEWAY:  It was a number.  It was several.

22           MR. WINDOM:  I can tell you that, Your Honor.  Five.

23           THE COURT:  Oh, because it is on this list?  Or some

24  other list?

25           MR. WINDOM:  It is not on that list.

1            THE COURT:  Okay.  All right.  So five calls.  All

2   right.

3            MR. SCHAMEL:  They have got a lot of lists, Judge.

4            MR. RIDGEWAY:  So, again, Your Honor, you know, we

5   -- you know, our office would have preferred for this hearing

6   to have happened rapidly after -- you know, we -- it just

7   didn't happen that way.  We did not get back before the Court

8   for this hearing -- for the bail review hearing on this

9   violation.  And, you know, for all the different reasons that

10  have kind have been -- gone through in the court today.

11           Since --

12           THE COURT:  So what happened with -- again, just

13  because we are -- I am trying to recreate the circumstances

14  here.  So was she placed on EM that night or --

15           MR. RIDGEWAY:  Yes.

16           THE COURT:  Okay.

17           MR. RIDGEWAY:  Yes, she was.

18           THE COURT:  All right.

19           MR. RIDGEWAY:  And so -- and since that date, you

20  know, as far complying with location monitoring, there has not

21  been any issues.  She has --

22           THE COURT:  Well, what was the modification that

23  Judge DiGirolamo made rather informally?  What was that?

24  Would that modification affect the electronic monitoring or

25  something else?

 1              MR. RIDGEWAY:  Your Honor, that was due only because

 2    our -- we were -- after numerous attempts -- I made numerous

 3    visits to her residence to attempt to fix the -- we were

 4    having issues with location monitoring equipment itself.

 5              THE COURT:  Right.  And that is what I am trying to

 6    get at.  What were those issues?

 7              MR. RIDGEWAY:  We could not get a good signal in the

 8    residence.  I don't -- I am not entirely sure if it was

 9    because of the concrete walls in the -- her condo.  You know,

10    it is a -- I have only had his happen one other time when I

11    could not get our equipment to function properly.  But it

12    would not function properly in her residence.

13              So we ultimately had to switch her over to the voice

14    ID system.

15              THE COURT:  But why isn't -- could a cell unit work?

16              MR. RIDGEWAY:  No, Your Honor.  Same -- I actually

17    went from a land-line unit to a cell unit.  Or actually, vice-

18    versa.  From a cell until to a land-line unit.  We actually

19    tried some -- another unit that was supposedly going to give

20    us more range.  None of those units functioned properly --

21              THE COURT:  Okay.

22              MR. RIDGEWAY:  -- in that residence.

23              THE COURT:  So when Judge DiGirolamo modified it to

24    voice recognition were you out of supervision at that point

25    and got transferred to someone else or did you --

 1              MR. RIDGEWAY:  No, I still retained this case.

 2              THE COURT:  Oh, you stayed?  Okay.

 3              MR. RIDGEWAY:  Yes.

 4              THE COURT:  So what has been going on since then?

 5              MR. RIDGEWAY:  She has been compliant with all my

 6    instructions as far as reporting in and the location

 7    monitoring parts.

 8              Your Honor, I think the other information is going

 9    to come from the Government.

10              THE COURT:  Right.

11              MR. RIDGEWAY:  But, again, our office's

12    recommendation hasn't changed since the initial appearance,

13    which is detention in this case.

14              THE COURT:  So what do you have her on exactly right

15    now?  What do you mean -- for the record, what does voice

16    recognition mean?

17              MR. RIDGEWAY:  So she gets calls randomly throughout

18    the day and she has to be there present to answer these calls,

19    she has to speak into the phone and repeat a series of numbers

20    that will verify it is her voice.

21              THE COURT:  So it is the same thing we use for

22    curfew?

23              MR. RIDGEWAY:  Correct.

24              THE COURT:  The voice recognition for curfew?  It is

25    the same the thing?

 1              MR. RIDGEWAY:  Same thing.  Same thing.

 2              THE COURT:  Okay.

 3              MR. WINDOM:  Is she on it completely right now?

 4              MR. RIDGEWAY:  Yes.

 5              MR. WINDOM:  And it is only voice recognition during

 6   the time ---, correct?

 7              MR. RIDGEWAY:  Right, 9 p.m. to 6 a.m.

 8              MR. SCHAMEL:  I am sorry, I just couldn't get the

 9   Government's questions on the record.

10              THE COURT:  Yes, I don't think they probably wanted

11   you to hear, but go -- what --

12              MR. RIDGEWAY:  Yes.  She --

13              MR. WINDOM:  I will speak.  My understand was there

14   was curfew -- voice Ident during curfew.  Not all day.

15              THE COURT:  Oh, okay.  All right.

16              MR. RIDGEWAY:  Correct.

17              THE COURT:  All right.  Okay.

18              MR. WINDOM:  And, Mr. Ridgeway, did -- before you

19   step back, did Ms. Bennett tell you anything on August 28th

20   about where exactly she had been after she left the

21   courthouse?

22              MR. RIDGEWAY:  Where she had been after the

23   courthouse?

24              MR. WINDOM:  Yes.

25              MR. RIDGEWAY:  Again, as I recall, she went -- she

1   said she went the wrong way on the beltway.  And that was

2   about it.  We didn't talk much about where she had been, I

3   don't believe.  I mean, I will check my notes here though.

4            MR. WINDOM:  No, that is what I was referring to.

5            MR. RIDGEWAY:  Okay.

6            MR. WINDOM:  That she had said she went the wrong

7   way on the beltway.

8            THE COURT:  Right.  And I just noticed this too, the

9   Defendant stated her phone was broken and later added that she

10  had silenced her phone.  So did you make any inquiry as to her

11  phone at all?  But she did call you, so why was her phone

12  broken?

13           MR. RIDGEWAY:  Yes.  Your Honor, --

14           THE COURT:  If she called you --

15           MR. RIDGEWAY:  Correct, Your Honor.  And I think --

16  you know, I think the Government has some other information.

17  But the screen was cracked.  I did inquire about her phone.  I

18  did see that it was cracked.  But, again, she was using her

19  phone and she has been using her phone.

20           THE COURT:  Right.

21           MR. RIDGEWAY:  So --

22           THE COURT:  Okay.  Counsel, do you have any kind of

23  informal questions for Mr. Ridgeway?  One or two questions

24  that you want to follow up on?

25           MR. SCHAMEL:  I think if, if I heard him correctly,

1  he said since the day of the 29th, there has been complete

2  compliance with everything he has asked of her.

3          He didn't -- there was a -- I am aware -- and maybe

4  I am wrong about this -- if there was a particular incident

5  like there was a fire alarm one night and she left so she

6  called in to make sure she was calling in property.  And he

7  was happy with that.

8          But my understanding since this initial court

9  appearance that I would like to talk about in a minute, Your

10  Honor, there hasn't been any complaints by Pretrial.  I am a

11  little troubled, candidly, by the fact that they haven't

12  changed their view about her flight risk even though she keeps

13  coming to court.

14          THE COURT:  Okay.  Well, don't worry about that.

15  But, Mr. Ridgeway, based on his question to you -- Counsel's

16  question to you, has she been compliant since this time?  And

17  did she call to say she had to leave the building because of a

18  fire alarm or something like that?

19          MR. RIDGEWAY:  Your Honor, there have been no

20  location monitoring violations to my knowledge.

21          THE COURT:  Okay.  Okay.  All right.

22          Mr. Windom?

23          MR. WINDOM:  Thank you, Your Honor.

24          So where was she and what was she doing?

25          MR. WINDOM:  Well, I think -- let me just see -- I

 1  got -- short circuit this because, not unnecessarily, but no

 2  one will ever convince me that she was experiencing stress

 3  from the days' event and kept taking wrong turns to return

 4  home.  So I -- you can conclude that I don't believe that.  So

 5  go ahead.

 6           MR. WINDOM:  I am going to hand up one other exhibit

 7  that had not intended to use.  I just handed it to Defense

 8  Counsel.

 9           Your Honor, at the time of the initial appearance on

10  August 28th, the Government had a pin up on Ms. Bennett's

11  phone.  It wasn't -- it didn't give us GPS location, but it

12  did give us cell towers.

13           We have her -- on this exhibit -- and I will just

14  put it up here on the screen.  Consistent with parts of what

15  she told Pretrial at the very top, this location.  She left

16  the courthouse.  She did go in the opposite direction on the

17  beltway.

18           Just for the record, Your Honor, it is at most a 25

19  minute drive from here to Ms. Bennett's home.

20           THE COURT:  Where in Chevy Chase does she live?

21           MR. WINDOM:  She lives right on the D.C. border.

22  She lives about --

23           THE COURT:  So Friendship Heights?

24           MR. WINDOM:  -- two, three blocks north of the D.C.

25  border on Wisconsin.

1              THE COURT:  So basically by Mazza, Friendship

2    Heights.   Somewhere around there?

3              MR. WINDOM:  Across from -- there is a Tiffany's and

4    all these fancy stores on the east side of the road.  She is

5    in a building on the west side of the road about a block past

6    the Starbucks there in Friendship Heights.

7              THE COURT:  Okay.  All right.

8              MR. WINDOM:  Two blocks from the Starbucks.

9              So she goes in the other direction on the beltway

10   around.  And then she comes up -- she goes around east side of

11   the beltway, appears to come through the city, and then up

12   through -- up on 34th.  Up on Rock Creek.  And most likely,

13   based on the fact that she was at Wisconsin and MaComb, she

14   probably took 34th Arena up through the city.

15             And then she is basically at home, near her home,

16   for an hour.  A solid hour before making contact with

17   Pretrial.  So she didn't just get lost.  She wasn't making

18   wrong turns.  She was physically in the vicinity of her home.

19   And we know it wasn't just, oh, the cell phone somehow is over

20   there and she is somewhere else because she is using it.

21             The bottom part of this is who she is calling.  You

22   can ignore the 1506 subscriber information.  That was an

23   earlier -- that was an earlier subscriber.  There is a

24   different subscriber than that individual there.

25             She left the courthouse.  She made a call.  She then

1    called her lawyer for 41 minutes.  Spoke to Mr. McNeal*, who

2    is an employee of hers.  Spoke to Mr. Fuentes, whose name

3    appears in the Pretrial report, at 4:02 p.m. -- being

4    completely consist with what Mr. Ridgeway said and Mr. Fuentes

5    said, that Ms. Bennett had called Mr. Fuentes at 4:02.  And

6    then she gets on the phone again with somebody from work and

7    she doesn't pick up the call from Pretrial.  She just doesn't

8    pick it up.

9         The phone wasn't silenced, the phone wasn't broken.

10   She just ignored it twice, 4:14 p.m., 4:17 p.m.

11        Then she just continued apace making phone calls.

12   She called Mr. McNeal again.  She called Mr. McNeal again.

13        THE COURT:  Is Mr. McNeal the person or the

14   assistant that Mr. Ridgeway -- or is that somebody else?

15        MR. WINDOM:  Mr. Fuentes is.

16        THE COURT:  Okay.  Okay.

17        MR. WINDOM:  Mr. McNeal is an employee.

18        THE COURT:  Okay.

19        MR. WINDOM:  His principle office is just on the --

20   it is actually at Chevy Chase Pavilion where that Cheesecake

21   Factory and all that stuff is.

22        THE COURT:  Okay.  Sure.  Yes.

23        MR. WINDOM:  Just --

24        THE COURT:  By Western.  I know where it is.  Yes.

25        MR. WINDOM:  Yes, exactly.  Western and Wisconsin.

1              THE COURT:  Right.

2              MR. WINDOM:  So she just ignores the calls.  And

3    then she is on the phone with McNeal.  And then she just

4    ignores two other phone calls.

5              Takes a call from Mr. Gremminger -- which I assume,

6    given the timing of what Mr. Ridgeway says in his report,

7    Mr. Gremminger called his client right after Mr. Ridgeway

8    called Mr. Gremminger and said, Hey, where is your client?

9              So she picks up the phone for Mr. Gremminger.

10   Appears that it could be a longer voicemail.  And then

11   ultimately she does call Pretrial, consistent with what

12   Mr. Ridgeway said, after five o'clock.

13             So you want context.  What was she doing?  Why was

14   she doing it?  Why did she not go straight home?  Well, we

15   submit that the evidence in the other charts that we provided

16   to you is that she was intent to find a way around the court's

17   no-contact order.  And she spent that time procuring another

18   phone.  She spent that time procuring a burner phone.  That is

19   the inference from all of the information that we have.

20             I will put up here, Your Honor -- that is the

21   purpose of her evasion of Pretrial, the sheer purpose.  So the

22   chart that we presented -- and we don't need to go past,

23   really that day, other than as context for why she did it, but

24   we start off at the top on August 25th.  She, Ms. Bennett, has

25   the detention hearing in New Mexico where she is not

1    represented by some stand-in flunky in New Mexico.  She is

2    represented by Jen Negolia on the phone from New York.  If

3    there was a problem with any of the conditions of release they

4    would be noticed.

5              So she walks out of New Mexico -- I think she got a

6    ride home from the agent because she had to -- or Pretrial

7    because she had to surrender her passport which was at her

8    residence.

9              And she then immediately violates the release order

10   that she just signed.  Immediately.  That is 9:45 p.m.

11   eastern, 6:45 -- 7:45 in New Mexico?  7:45 in New Mexico.  She

12   has just gotten home and she violates right away using her own

13   phone.

14             So she violates with Ms. Pesner*, again with

15   Ms. Pesner.

16             Mr. Collins is an interesting case --

17             THE COURT:  So let me just understand something,

18   Mr. Windom.

19             MR. WINDOM:  Yes.

20             MR. SCHAMEL:  So Pesner -- just in that section that

21   we are talking about right now -- Pesner, Collins, and

22   Johnston -- are all of them on the no-contact list that the

23   magistrate judge in New Mexico ordered no contact with as a

24   condition of release?

25             MR. WINDOM:  Every single person on this list.

1            THE COURT:  Okay.

2            MR. WINDOM:  And there are two sections of the no-

3   contact order.  One is no contact, period.  One is no contact,

4   essentially, about the case.  These people are all in the no-

5   contact, no contact, period, list.

6            So she violates.  She violates.  She violates.  She,

7   on the 26th -- there is an interesting way of violating, which

8   apparently doesn't show up on the toll records, Facetime.

9   Because you go through Apple's proprietary technology.  So she

10  has an extensive Facetime conversation with one of the people

11  that she was prohibited from contacting.

12           She then flies --

13           MR. SCHAMEL:  I am sorry.  Is that -- I just want to

14  inquire with Government Counsel -- is that on here?  I am just

15  not seeing it.

16           MR. WINDOM:  Yes.  Facetime.  Type, Column B, Row 5,

17  6, 7.

18           MR. SCHAMEL:  All right.  Just -- may I approach,

19  Your Honor?

20           THE COURT:  Yes, sure.  Yes.

21           MR. SCHAMEL:  I am just trying to follow on here.

22  Show me.  Okay.  Got you.

23           THE COURT:  So if you look at column A, then there

24  is column B that says, "Type."

25           MR. SCHAMEL:  Yes.  I got it now.  Thank you, Your

1    Honor.

2             THE COURT:  And then it says, "Facetime."  Right.

3             MR. SCHAMEL:  I was looking for a different section.

4    I didn't catch A and B.  Thank you, Your Honor.

5             THE COURT:  Sure.  Okay.  That is fine.  No problem.

6             MR. WINDOM:  She flies back east.  And she gets in

7    contact with her personal assistant, Mr. Fuentes.  And for

8    whatever reason -- but of course, the logical assumption is

9    that she knows she shouldn't be talking to people -- she gets

10   Mr. Fuentes' phone.  And that is the yellow highlighting.  And

11   she calls Mr. Collins using Mr. Fuentes' phone.  Outgoing call

12   from Mr. Fuentes' phone and then Mr. Collins calls back.

13            THE COURT:  So let me -- and then if you choose not

14   to answer, you do so, that is fine.  What evidence does the

15   Government have that that call from Mr. Fuentes, the 8588

16   number, to Mr. Collins wasn't in fact Mr. Fuentes, but was

17   Ms. Bennett?  Why isn't it just as logical that Fuentes called

18   Collins?

19            MR. WINDOM:  We understand that Mr. Fuentes picked

20   up Ms. Bennett from the airport when she arrived on the east

21   coast and I -- without going into massive detail -- we had

22   spoken with Mr. Collins.

23            THE COURT:  Okay.  All right go ahead.

24            MR. WINDOM:  So then she resorts to using her own

25   phone again.  This is Saturday, by the way, August 26.  She

1   uses her phone to attempt a Facetime call with Mr. Collins.

2   And then receives a text message from Mr. Johnston on the --

3   morning of the 28th, which is when she appears here in court.

4   She was scheduled for an 11 a.m. hearing.  So she receives a

5   text message from Mr. Johnston about three hours before she

6   comes here.

7          Then she has her hearing downstairs in 1A with Judge

8   DiGirolamo.  She is released on conditions including location

9   monitoring.

10         And here is where it gets interesting.  The orange

11  phone is Steve Gremminger's phone.  That phone call --

12         THE COURT:  So the 4162 is her attorney's call --

13  phone number?

14         MR. WINDOM:  The --

15         MR. SCHAMEL:  Were you on line 13?

16         MR. WINDOM:  Yes.  Line 13 is Mr. --

17         THE COURT:  Okay.  I got you.

18         MR. WINDOM:  And he can confirm or deny, but that is

19  our understanding.

20         THE COURT:  Okay.

21         MR. WINDOM:  But that is his phone.  Interesting

22  part about this is she is supposed to be in the courthouse.

23  It is 1:42 p.m.  I randomly had a two p.m. hearing downstairs

24  in 1A.  I was sitting outside on the bench having some potato

25  chips at 1:50.  This call lasted six minutes.

1            I saw Ms. Bennett in the lobby with her counsel two

2    minutes after this call concluded.  She was in the courthouse

3    when she borrowed her lawyers phone to violate the order that

4    Judge DiGirolamo had just placed on her.  Again, advancing the

5    understanding that she knew she shouldn't be getting in touch

6    with these people.

7            Another reason we know that she knew that is because

8    she told Mr. Collins on this phone call, I shouldn't be

9    talking to you.  So then she leaves.

10            Then we get to the Pretrial part.  Three p.m. she

11    left the courthouse.  We have already put up the pin

12    information, but essentially she is in the vicinity of her

13    office for an hour.  And then she meets up with Pretrial

14    around 5:13.

15            The logical inference from the information that we

16    have is that she used that time to buy a burner phone, which

17    we put up there -- to either buy or acquire from somebody

18    else.  Perhaps Mr. Johnston.  Perhaps some other source.

19            We put up there the tracfone subscriber information

20    for this particular cell phone number.  This phone was

21    activated on the same day, August 28th.  Right here.  And the

22    way -- and my understanding of the way tracfones work is you

23    buy the phone and you buy the plan.  So you can buy a tracfone

24    phone, but you can also buy a tracfone card as well, to

25    populate the minutes.  And this was a pay as you go plan.

1          So the card was activated at 7:23 p.m.  Two hours

2    later the card is activated the same day that she is ordered

3    to report home.  So the logical inference of all of this is

4    that she knew that she wasn't able to talk to these folks, she

5    knew that her phone was hot, and she went to go get another

6    phone.  And then she activated it from her residence where she

7    was on location monitoring at that time.

8          And she didn't take a slow start to this.  There

9    wasn't a slow approach.  She immediately got on the phone with

10   -- let's see the number -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11

11   people on the no-contact list --

12         THE COURT:  Can I just ask you a question?  I don't

13   mean to interrupt your train of thought.

14         MR. WINDOM:  Yes.

15         THE COURT:  But I am trying to -- the phone that the

16   Government seized a little while ago pursuant to a warrant

17   that -- I didn't do it so I guess another magistrate judge did

18   it -- was that the burner phone?  I will just use it as a

19   broad -- I will just use that colloquially -- a burner -- was

20   that the burner or was that her other 202 number?

21         MR. WINDOM:  It was the cracked iPhone.  It was not

22   what we are calling the burner phone.

23         THE COURT:  Okay.  All right.  Thank you.

24         MR. WINDOM:  So she --

25         THE COURT:  You mean the iPhone that wasn't working

 1   but the record shows that she was using it?

 2            MR. WINDOM:  Yes.  Which works.

 3            THE COURT:  That one.  Yes.  Okay.

 4            MR. WINDOM:  Which I saw the screen on.  It is

 5   cracked in the bottom left hand corner.

 6            THE COURT:  Right.  All right.  Go ahead.  Thank

 7   you.

 8            MR. WINDOM:  So she gets right to it.  I mean, she

 9   gets right to it.  And she calls any number of witnesses that

10   she knows that she is not to have any contact with in any way.

11   These folks, the Government contends are victims in this case.

12   They are investors fraudulently induced to provide funds to

13   Ms. Bennett, Janice Raji*, Susan Pesner again, Mr. Collins.

14            There is another phone number on there that is the

15   same city of Ben Collins.  It appears as the same street or

16   nearby where he lives, but we just put "City" then "Collins"

17   because we didn't have the subscriber info for that phone for

18   him.

19            Then Collins again, Mr. Johnston, Mr. Johnston,

20   Mr. Eickelston*.  Calls, texts, you name it.

21            This is why she did not go straight home, so that

22   she could acquire a phone.  These records only go through

23   September 3rd.  She is burning through her minutes.  There is

24   three pages.  There is 130 separate violations.  And I -- you

25   know, there is only so many times you can hear the word

1  technical about a violation before you have to say something

2  about it.

3        These aren't technical violations.  The entire

4  reason these people are on this list is because they are going

5  to be witnesses in this trial.  She has clearly had

6  substantial sway over them for a number of years to induce

7  them to provide funds as part of this fraud scheme.  She is

8  not -- she was using her iPhones in order to --

9        THE COURT:  Let me interrupt.  I mean, I don't know

10 why I ask people if I can interrupt because I can interrupt

11 anytime I want.

12        MR. WINDOM:   I will stop whenever you tell me.

13        THE COURT:  But let me ask you this, so -- because I

14 know what he is going to get up and say because he has already

15 said it in his limited conditional appearance.  He is going to

16 say, Judge, the affidavit and the conduct alleged by this

17 Defendant in the affidavit is not remotely the same as the

18 indictment that was returned by the grand jury.  In the

19 indictment returned by the grand jury we have $750,000 line of

20 credit or loan from Eagle Bank that was maybe misused or lied

21 about in the process.  She said it was allegedly for capital.

22 And then the grand jury has been able to show that, you know,

23 her definition of capital is, you know, lifestyle of the rich

24 and famous, and not anything to do with working capital in the

25 traditional sense.

1              So don't you think at some point, Mr. Windom -- I

2    doubt if want to agree with this, but I have just got to ask

3    you -- that what should I make of the fact that what she is

4    actually -- I guess the criminal complaint is still out there

5    somewhere.  I mean, that is still a live case, or did it get

6    merged into this indictment, or --

7              MR. WINDOM:  My understanding of that process, Your

8    Honor, is that the indictment takes over the case.  Our

9    intention, as we told Defense Counsel, is at some point in the

10   not too distant future, to seek a superseding indictment

11   containing at least the additional charges outlined in the

12   criminal complaint.

13             THE COURT:  Okay.

14             MR. WINDOM:  I --

15             THE COURT:  Which would materially increase the

16   alleged fraud laws for guidelines purposes and everything

17   else?

18             MR. WINDOM:  Back up to -- I had estimated loss at

19   this point of over 14 million dollars.

20             THE COURT:  Fourteen?

21             MR. WINDOM:  Yes.

22             THE COURT:  Okay.

23             MR. WINDOM:  But, again, given the context, she has

24   not been indicted on that charge yet.  She is contacting the

25   people that she is ordered not to talk to on that chart.

1              So there is, you know, pages and pages of this.  She

2    -- and by the way, we know the burner is her phone, not

3    because there is some subscriber record that says it is her

4    phone.  The subscriber record just says Chevy Chase.

5              One of the people that she called says that she

6    called them on this phone, on this 301 number.  So that is how

7    we know it is her phone.  And based on what Defense Counsel

8    said a moment ago, I am not sure that they are going to

9    dispute that this is her phone.  But we will find out.

10             So that is the context of why she did not obey

11   Mr. Ridgeway.  She needed to find a way to contact people not

12   using her own phone.  And even then, she was forced -- for

13   whatever reason -- to resort to using her own phone from time

14   to time to get in touch with folks who maybe they weren't

15   picking up the call because it was some number not in their

16   phone.  Who knows?  But the vast majority of the contacts are

17   using the burner through the day that these end on September

18   3rd.

19             I am putting up on the screen the summary of what

20   that is.  This summary does not include the Facetime calls on

21   there.  But we are talking about 600 minutes maybe in five

22   days -- six days after she has sworn under penalty of perjury

23   and under threat of contempt of this Court to follow the

24   Court's restrictions.  Including not to contact folks.

25             So we can -- you know, we could go into every single

1    -- all the rows of these to explain it more.  But if Your

2    Honor just want to stick with what the bail review issue was,

3    this is the context.  This is why she did it.  She did it in

4    order to acquire the phone.

5           Now what does that mean?  So 3148, you got two

6    things.  You got both the federal crime, contempt of court,

7    which she said in the release order that she understood, if

8    she violates the order you get -- she could be prosecuted for

9    contempt of court.  She signed it.  She understands that.

10          There is also potential witness tampering as well,

11   federal crime.

12          Second of all, just a violation of her release

13   order.  There is obviously probable cause to find that she was

14   in contempt of Judge DiGirolamo's order, which creates the

15   rebuttable presumption in favor of detention.  Otherwise,

16   there is clear and convincing evidence that she was in

17   violation of the release order.

18          There is zero percent chance that we can fashion

19   anything to contain this Defendant.  In our argument to

20   Judge DiGirolamo we argued flight risk, sure.  We also argued,

21   more strenuously that under 3142 she couldn't be released

22   because she was going to go obstruct, because she was going to

23   go talk to witnesses.

24          We pointed Judge DiGirolamo to a part in the

25   criminal complaint where she had done just that in relation to

1    one of her employee's SEC testimonies.  She was writing down

2    notes in emails about what this guy should say in his

3    testimony.

4              So we relied on that in seeking detention before.

5    She walked out of the courtroom.  She didn't even have to walk

6    out of the courthouse before she proved us right.  She used

7    her lawyer's phone to break Judge DiGirolamo's order.  She has

8    got to beset that.

9              THE COURT:  So the Government -- your position is

10   that there are just absolutely -- I could -- that even if I

11   locked her down again and made her move to a different address

12   so I could get her on a bracelet and took away her ability to

13   use a cell phone, period -- I don't care about her business or

14   not -- took away her ability to use a cell phone, took away

15   her ability to access internet capable devices, have them all

16   monitored if she was using them at her expense, that all of

17   those, even additional conditions of release, are still not

18   sufficient in terms of the Government's belief that -- I guess

19   your argument at the end of the day is you are moving for

20   detention -- I guess, that she is a serious risk of

21   obstruction, which I can move for it.  I mean, anybody -- the

22   Government can do that *sua sponte*.

23             MR. WINDOM:  Yes.

24             THE COURT:  So is that the argument?

25             MR. WINDOM:  Yes, Your Honor.  And it is

1   demonstratively true.  There is no way that you can ensure

2   that a defendant does not get a phone.  Especially where there

3   is a propensity to not just get -- you know, use her own

4   phone, but to go get a burner, go use two other people's

5   phones in this.  She has visitors at the house.  She borrows

6   their phone.  She has visitors at the house -- she orders

7   groceries from Giant and put in a phone on the -- you know, at

8   home delivery option, if they have such things.  Or CVS home

9   delivery or any of those places, all of which have disposable

10  phones.  There is no way to monitor it.  There is no way to

11  ensure that she is not going to keep on ---.

12              THE COURT:  Okay.  All right.  Counsel?

13              MR. SCHAMEL:  Giant does have home delivery, Your

14  Honor.  If they didn't I wouldn't be near this fat.  My wife

15  uses it all the time.  It is quite good.

16              So on the issue of this, the 29th, I think there is

17  a couple of important things to point out.  First and

18  foremost, she has been perfectly compliant with Pretrial and

19  they don't have any complaints with her since that day.

20              I am looking here, again -- this is another

21  document.  I am not sure why this was a big secret, but it was

22  handed to me a second before it was handed to you, Your Honor.

23  And it looks like she left the courthouse, was on the phone

24  driving the wrong way.  Did get lost, which is consisted with

25  what she told Pretrial.  And she was on the phone with people

1   she is allowed to talk to, including her lawyer for 41 minutes

2   -- her prior sort of lawyer, not lawyer not any more, lawyer.

3   The lawyer who told her not to come to court, lawyer.

4          And it looks like she has missed voicemails from

5   Pretrial.  She gets the call from Mr. Gremminger and -- a

6   little bit slow for my liking -- it is 13 minutes later she

7   calls Pretrial later at 5:06 as Pretrial recorded.

8          What this looks like to me, candidly, is somebody

9   who somebody makes sure they already turn off their phone when

10  they walk into court.  I always get yelled at by my wife why I

11  don't answer the phone in the afternoon because I forgot to

12  turn it back on.

13         She is on the phone.  She is making calls.  She is

14  making calls -- I don't think she said the phone didn't work.

15  I think the issue was about whether or not it was ringing and

16  coming in to her.  And then she has been compliant since on

17  the issue of Pretrial and what is before us.

18         On the issue of the chart that we just went through,

19  I told Your Honor, I mean, I have had this chart for just

20  about a minute or two more -- maybe eight minutes more than

21  you have had it.  So I can't say.  Like, I don't know who

22  Mr. Fuentes is or what he would say.  I haven't talked to

23  Mr. Collins.  I don't know.

24         I can tell Your Honor that I am not exactly sure I

25  agree with one of the representations Government Counsel made

1    about an email on the SEC.  We can sort of agree to disagree

2    on what that emails says.

3           So I think, you know, perspective being the driver

4    on some of those things, how you look at them.  But I think

5    the more important issue if Your Honor is going to entertain

6    the question as it relates to these -- what they call myriad

7    violations, is 130 calls -- there are conditions.  There are

8    sets of conditions.  And --

9           THE COURT:  How do you reasonably -- and this is

10   rhetorical, but not really -- how do you reasonably assure

11   that a sophisticated criminal defendant -- and I believe that

12   Ms. Bennett is sophisticated -- and how do you reasonably

13   assure, given what the Government has proffered so far today,

14   that she has the capability and the financial ability to

15   thwart conditions of release and bend them -- and there is no

16   real ability, except for detention -- and by the way, as

17   everybody knows too, there are burners in cell blocks, too.

18   So let's be real about that.

19          You know, so when somebody is like Ms. Bennett who

20   is a sophisticated business person who -- you know, using

21   other people's phones and calling people that the judge -- the

22   court told her not to call, I mean, how do I fashion any kind

23   of conditions of release that will reasonably ensure that she

24   won't engage in such conduct that, you know, could subject her

25   to obstruction or witness tampering?

1              And I know you are going to say, I am not that kind

2    of lawyer.  I am going to read her the riot act, blah, blah,

3    blah.  But, you know, that is not really an answer for me.  I

4    mean, what are the least restrictive conditions, other than

5    detention, that can correct this tract record in such a short

6    period of time where it is obvious to me and -- you know, and

7    I take back the fact -- I mean, I don't take it back because

8    she just went the wrong way on the beltway, but -- which I

9    don't understand because she probably came from Chevy Chase

10   there and then she decided to go home the long way.  And, you

11   know, when I return to my house in Montgomery County I never

12   go back to Montgomery County by Branch Avenue.

13             But setting all that aside, it took her two hours to

14   go from this courthouse or from 295 at the BW Parkway -- two

15   hours roughly before she even spoke to Pretrial.  And the

16   Government has made a pretty compelling case of what she has

17   been doing.  She just doesn't want to follow what Pretrial

18   tells her.

19             Now she is in compliance, maybe.  But what are the

20   conditions of release that, if I am going to change these

21   conditions -- which I can -- what are you suggesting other

22   than detention?  Because this is a pretty bad case for

23   Ms. Bennett, in my mind.

24             MR. SCHAMEL:  I think it is a fair assessment, Your

25   Honor.  It is a fair read of it.

1          What I won't say -- and I am not standing up here,

2    Your Honor, to say like somehow I have magic; right?  I am

3    some different lawyer and so it will different because I say

4    it will be different.  I don't even possess that sort of

5    hubris to even make that argument.

6          But what I think is -- and I am often struck when I

7    -- particularly career prosecutors, when they make discussions

8    about let's put people in cages, people need to go to jail,

9    and we need to send to them, whether it is CTF at D.C. or down

10   at Chuck County or someplace -- you know what that actual

11   means, you know?  That is what we need to do to this woman.

12   That is where she needs to be until maybe June, or May, or

13   whenever they get around to their superseding indictment and

14   we get a trial date.

15         It troubles me.  It troubles me having been in 50,

16   60 jails, prisons, you know, county lockups, super-max, to

17   camps.  It is -- that is a pretty onerous ask.  And it is an

18   onerous ask because not only does it impact her mental health

19   and what she can do to help assist in her own defense, but how

20   difficult it makes it to even put on a case.

21         And, Your Honor -- I don't have to tell you, you

22   have probably represented more detained defendants than I have

23   in your career.  And it is a pretty significant ask.

24         That is why when they drafted the statute they say

25   let's find what is better.  What can we do that is more

1  reasonable?  And I think, frankly, at this point, she probably

2  has lost her right to telephone privileges, at least for the

3  foreseeable future.  I think that is completely reasonable.

4          She was living in New Mexico.  The reason she has

5  been living here and now is because of this case.  I don't

6  know if the Court wants to put her on monitoring in New

7  Mexico.  I am guessing there is a lot of -- never been there.

8  So I am guessing there is a lot of wide open spaces and they

9  don't have any cell --

10         THE COURT:  I looked at that too, by the way.  I

11  mean, I really wish I had like 176 acres and a 13-bedroom

12  house and 11-bathroom house in New Mexico that I could live

13  in.  I mean, I really wish that which -- I wish I had that.

14         MR. SCHAMEL:  I would take a little one of those

15  adobes out in New Mexico, Judge.

16         THE COURT:  But -- and I don't know why she can't --

17  Ms. Bennett, please have a seat.

18         You know, and I don't understand all -- and I say

19  that not because I want to live the life of the rich and

20  famous.  I say it because I think it is a part of her scam not

21  to lawyer up.  She has got all of these properties.  She lives

22  in a penthouse.  She has got this house in New Mexico that --

23  what I saw -- went on the market for nine million dollars at

24  some point and she bought it, apparently.

25         So, you know, she is very sophisticated.  That is

1   what I meant about sophisticated.

2           MR. SCHAMEL:  I am not saying she is not.  I don't

3   disagree --

4           THE COURT:  And she's a trickster.

5           MR. SCHAMEL:  I don't think that is fair, Judge.  I

6   mean, and here is --

7           THE COURT:  All right.  Well, I am the judge.  Go

8   ahead.

9           MR. SCHAMEL:  You are.  But I am the lawyer.  I am

10  allowed to say that I don't necessarily agree with you.

11          THE COURT:  On your limited conditional

12  representation of a client that you really have -- don't even

13  really know yet.

14          MR. SCHAMEL:  Lawyer for the day, but 20 years of

15  practice in criminal defense --

16          THE COURT:  Go ahead.

17          MR. SCHAMEL:  -- around this jurisdiction and across

18  the country.

19          THE COURT:  Tell me, sir, what this -- let's not --

20  I mean, as much as I enjoy this banter with you, tell me what

21  you recommend for Ms. Bennett short of me sending her out that

22  door right now because she is a -- she cannot help herself

23  from committing obstruction of justice and she has violated

24  the release conditions in this case?

25          MR. SCHAMEL:  She does not have a phone.

1              THE COURT:  So tell me what I should do.

2              MR. SCHAMEL:  She does not have a phone.  It has

3    been taken the federal agents this -- earlier today.  She

4    should not be allowed to get --

5              THE COURT:  How doesn't she -- how do we that she

6    doesn't stop at the CVS or the Giant and get a new burner, or

7    have Mr. Fuentes get a new burner, or use somebody else's

8    phone to make calls to people that she can't have contact

9    with?  How will we ever -- not me.  Because I don't care.  How

10   will the Government be able to -- or Pretrial be able to -- it

11   is really Pretrial.  How will Pretrial be able to supervise

12   that to make sure that she is compliance with the release

13   conditions?

14             MR. SCHAMEL:  Didn't they just show us that they

15   can?  I mean, isn't the proof right there in the pudding?

16   They say she gets a burner phone and they can't supervise her

17   -- they have got the phone -- and I hate that term, too.  She

18   issues of pre-paid tracfone and they say she made all these

19   phone calls to all these people on a prepaid tracfone.  So I

20   think there is your answer, Your Honor.  It is very -- it

21   seems to be -- I don't know.  I am not the Government.  But it

22   seems to be pretty easy to do.

23             So if she has a very clear, specific order from Your

24   Honor that she is not to purchase any new phones, enter into

25   any phone contracts, borrow anybody's phones, have any phone

1  use, put her back on GPS monitoring.  I mean, I think that is

2  pretty easy.  If it is as Mr. Windom would like us to believe

3  that is inescapable that she is going to do it, well, my guess

4  is she would do it tomorrow and we will be back on Monday;

5  right?

6          They have these 35 people.  They are clearly all

7  being talked to by the federal agents.  So my guess is none of

8  them -- even the ones who want to speak to her -- are going to

9  lie to federal agents or want to get themselves caught up in

10 some sort of aiding and abetting.  She probably already has,

11 given what Government Counsel has told us, pulled some new

12 charges for a superseding indictment on obstruction.  They

13 will try to make those charges against her.

14         But to put her in jail until there is a trial date

15 for a superseding indictment is excessive.  It is excessive on

16 the circumstances of this case.  It is excessive on this

17 indictment.  It is excessive on these allegations.

18         She is sophisticated.  I am not saying she is not.

19 But I don't think that there is -- the same of having this

20 real estate as the same of liquidity; right?  The fact that

21 she is trying to hire lawyers and trying to find a lawyer, and

22 she is probably doing it in short order.  And, frankly, may

23 have me as early as early next week.

24         I think the other thing that the Government is

25 missing -- and I think Your Honor probably knows this as well

1    as I do as well -- she is now sitting here scared to death for

2    the first time in this case.  She has a lawyer, unlike lawyers

3    who say don't bother coming to court, this isn't a big deal,

4    this is just the SEC run a mock, there is nothing to this

5    case, this is stupid, and the things that she had been hearing

6    before Monday.

7            Now she is hearing I make -- she has heard a federal

8    magistrate judge say, What is to stop me from taking her

9    through that door and putting in a cage for the next six

10   months?  That has a pretty significant impact on every human

11   being in the world.  So we are in a different place.  It is a

12   new paradigm.  Your Honor has this case.  It is going to stay

13   with Your Honor, I am quite certain.  I am going to stay, and

14   if I can, I am going everything I can to make that happen.

15   And I think Ms. Bennett could not be more crystal clear what

16   the repercussions are.

17           My guess is, and if Your Honor hasn't said it

18   already or will say, Ms. Bennett, there will not be a third

19   strike.  Ms. Bennett, if there is a single -- not 130, not

20   114, not 98 -- if there is a single violation of my order,

21   which is going to be as clear and as concise as can possibly

22   be, there won't be need for a hearing.  You are going to be

23   held pending trial.

24           I think that is the ramification, Your Honor.  I

25   think that is the resolution.  I think that, frankly, is what

1    is in the interest of justice.

2              THE COURT:  Mr. Windom, anything else?

3              MR. WINDOM:  Just briefly, Your Honor.

4              I mean, she is asking for a mulligan which you don't

5    get on the pro tour and you don't get in Federal Court.  She

6    has been in -- you are the third magistrate judge who the

7    Defense would have you just tell her the exact thing that two

8    other magistrate judges have already told her.

9              In New Mexico she was told by that magistrate judge.

10   And not just told, but as with all defendants, she signed.

11   She signed the New Mexico release order saying I recognize I

12   can't do these things.  So then three days later she says, oh,

13   here --

14             THE COURT:  Do you have the -- can I see a -- do you

15   have a complete copy of that New Mexico --

16             MR. WINDOM:  Yes, sir.  I will hand it up right now.

17   And I will hand it up with Judge DiGirolamo's order which I am

18   about to put on the screen.

19             THE COURT:  Yes, I have his.  But --

20             MR. WINDOM:  Okay, great.  So --

21             THE COURT:  Counsel, do you have the complete --

22             MR. SCHAMEL:  I don't have the New Mexico, Your

23   Honor.

24             THE COURT:  Okay.

25             MR. WINDOM:  Judge DiGirolamo said the exact same

1   thing --

2            THE COURT:  Do you have the New Mexico --

3            MR. GREMMINGER:  I have it, yes.

4            MR. SCHAMEL:  Oh, ---

5            THE COURT:  Yes.  Your local counsel has it.

6            MR. GREMMINGER:  It will take me a moment to get it,

7   Your Honor.

8            THE COURT:  Yes, sure.  Go ahead.

9            MR. SCHAMEL:  Local like here?

10           MR. WINDOM:  So the jest of it is this, she lied to

11  two separate magistrate judges, she lied to Mr. Ridgeway's

12  face a few hours after she left this courthouse.  And she

13  presumably lied to her own local counsel when she said, Hey,

14  can I borrow your phone, downstairs in this courthouse an hour

15  and 42 minutes after walking out of court with Judge D.

16           THE COURT:  Okay.  All right.  Anybody else wish to

17  say anything?

18           All right.  So this is a bail review hearing.  There

19  is really two issues here.  One is the representations issue,

20  which we will put on the side of a second.  But here is the

21  reality -- and, Ms. Bennett, I have been sparring with your

22  lawyer and -- your conditional limited lawyer and your local

23  counsel lawyer kind of facetiously, but don't overlook the

24  importance of getting a lawyer in a case like this.

25           I am going to treat you the exact same way that I

1   treat every single criminal defendant who goes off on -- goes

2   out on release conditions and who violates those release

3   conditions.  I have no doubt, and I believe the evidence is

4   sufficient for me to conclude, that you have engaged in

5   conduct that, although may be subject to contempt of court --

6   the Government can charge you with that if they want and/or

7   obstruction or witness tampering.  But what is clear to me,

8   and I don't even have to reach -- I don't even really --

9   concluding what I am going to do, I don't even really reach

10  any of the no-contact calls and the use of the phones.

11          Yes, it is really disturbing that you are using your

12  lawyer's phone and making him a co-conspirator to your

13  violation of a federal judge's order.  But I don't really even

14  need to go there.  I am only going to restrict myself to the

15  note of apparent violation for your conduct with Mr. Ridgeway

16  and it is inexcusable.  And you knew exactly what you were

17  doing.  The data reflects it.  And you were talking to

18  everybody under the sun, except for Mr. Ridgeway.

19          And you can shake your head all you want.  It is not

20  going to make a difference to me.

21          And that he told you to go directly home and you

22  didn't go directly home.  And there are consequences for your

23  conduct.  And you are now charged as a criminal defendant and

24  your station in life is irrelevant.  And it would be totally,

25  totally, totally, totally inappropriate and wrong for me to

1    give you a pass on this when I don't give anybody a pass and

2    there is a whole litany of people who know that my philosophy

3    is I will put you out on release, you violate it, you go in.

4             I don't think that you need to stay in custody for

5    the entire duration of the case.  I don't think that you need

6    to stay detained until May, or June, or July, whenever this

7    case comes around.  But I do think you think a wakeup call.

8    And I think you need to be told, and I am about to tell you,

9    that your life is not our own anymore.

10            You are now a criminal defendant in a federal court

11   case in this district.  You can live on a ranch.  You can life

12   in a penthouse.  It doesn't matter.  You are going to be

13   treated the same way that an 18-year-old or a 25-year-old

14   young man who was born and raised in Prince George's County

15   and gets charged here gets treated.

16            You are going to be detained and remanded to the

17   custody of the Marshal.  It is not going to be forever.

18   Limited counsel or local counsel can file a motion for

19   reconsideration.  I am going to put you in for a couple days.

20   And then I am going to let you back out.  And then we are

21   going to talk about a brand new clean slate of release

22   conditions.  And there are consequences for noncompliance.  It

23   is not the end of the world.  You are not -- and I will tell

24   you right now, I don't care what the Government says, they can

25   come -- unless you use a burner phone in the jail, I am not

1   going to keep you in custody.

2          I recognize your criminal -- lack of criminal

3   history.  I recognize all of the factors that weigh in your

4   advantage for release conditions.  And I believe there is a

5   possibility of conditions of release, onerous, suspect to

6   whether or not you are going to comply with them or try to

7   bend them and do your own thing and think that what I say

8   doesn't matter.  But I am not Judge DiGirolamo.  And I am not

9   some judge -- one of my colleagues in New Mexico.

10          You bare responsibility for your conduct, which is

11   violating Judge DiGirolamo's order.  You are going to pay the

12   consequences for that and I do find right now, just on the

13   obstruction alone -- setting that aside -- forget it.  Under

14   3148 I find that you have violated the release conditions set

15   by Judge DiGirolamo.  And at this point in time, I find that

16   there are grounds to believe that you are highly, highly

17   unlikely to abide by any of the conditions, particularly the

18   no-contact order.  And you are going to be detained and

19   remanded to the custody of the Marshal.

20          And, you know, we can talk with Counsel about

21   setting this in sometime rather quickly.  But you need to go

22   in and you need to think about following release conditions.

23   And I put people in for smoking weed.  You know, that --

24   marijuana is a federal crime.  You test dirty, good bye.  And

25   I don't see the reasons why I should treat you any different

1   than anyone else.

2           I understand that your lawyer is saying and he is

3   great.  He has done a great job for you.  But there are

4   consequences for your conduct and right now you are detained

5   and remanded to the custody of the Marshal.  And at the

6   appropriate time, somebody can file a motion and ask me to

7   reconsider.  We will file -- we will set this in for a hearing

8   and we will move forward then and set a new set of conditions

9   of release that you may well think you could just stay in jail

10  because they are going to be -- you are a hard case to figure

11  out because you are very smart, the allegations against you

12  are very serious, and you are clever.  And I just see it from

13  the record here.  And it is going to be a challenge for me to

14  fashion release conditions that are appropriate for you, but I

15  am willing to do that and am willing to give it a try.  But I

16  think right now detention is appropriate.

17          Ma'am, you are remanded into the custody of the

18  Marshal.

19          Any other medical issues that your client has while

20  she is in custody?

21          MR. SCHAMEL:  That is exactly what I was going to

22  ask, Your Honor.  I haven't had a --

23          THE COURT:  On the -- yes, just on the corner of the

24  table there so we don't say it out loud -- but on the defense

25  table there is a communication of health claims form.  So just

1  have a seat with your -- just fill it out with her so we don't

2  have to say it in court in front of everybody and I will look

3  at it.

4          MR. SCHAMEL:  Right now while we are at the counsel

5  table?

6          THE COURT:  Yes.

7          MR. SCHAMEL:  Okay.

8          THE COURT:  See, there is a form there, right, that

9  says Communication of Health Needs?

10          MR. SCHAMEL:  Oh, I didn't see that.  Okay.

11          THE COURT:  Yes.  So just fill that out with

12  Ms. Bennett and then pass it up to me.

13          MR. SCHAMEL:  Your Honor, may we -- could -- I would

14  ask while we are filling that out because I do think there is

15  a couple issues that he is going to put down -- Mr. Gremminger

16  is going to put down.  Can we stay this until tomorrow that

17  she can -- wherever she is going to be remanded so that she

18  can -- if there is medications and things that need to be

19  done?

20          THE COURT:  No.  Let's see what the health -- I have

21  got people with bypass, I have got people with -- I got

22  another set of lawyers here that are waiting that -- I have

23  people who are in custody all the time with kidney disease,

24  all kinds of heart disease, diabetes, cancer.  So no, I am not

25  staying it.  She is going in tonight.  But just let me see

1   what is on the form.

2            And while you are filling that out, Counsel, I am

3   going to grant Ms. Gremminger's motion to withdraw.  I mean,

4   sir, so your motion ECF number 20 where you have asked to be

5   relieved from any other responsibility in this matter is

6   granted.

7            MR. GREMMINGER:  Thank you, Your Honor.

8            THE COURT:  And you are no longer required to attend

9   any hearings and/or any proceedings in this unless you want to

10  reenter your appearance.  But I have granted the motion and

11  you are discharged from any other further responsibility.

12           MR. GREMMINGER:  Thank you, Your Honor.

13           THE COURT:  Mr. Schamel, --

14           MR. SCHAMEL:  Yes, Your Honor.

15           THE COURT:  -- if you can multitask, I need an

16  answer from you sooner than later about whether you are going

17  to be retained by Ms. Bennett to represent her.  And I will --

18  if you want to continue that discussion with her, I will ask

19  the Marshals to make sure she is available to him after these

20  proceedings so you can talk about what you need to talk about.

21           I don't want her -- she needs to be represented by

22  an attorney.  If she can't work out rule one with you, I need

23  to get her back quickly for an attorney inquiry hearing and

24  consider the appointment of counsel for her under a

25  contribution order because she needs to be represented, and I

 1   don't want her to be unrepresented for any period of time.

 2        But Mr. Gremminger, he doesn't need to stay.  This

 3   is like he wakes up in cold sweats at night thinking about

 4   what he got himself into.  So I am keeping you in as your --

 5   you are now -- your limited conditional representation is

 6   going to carry on moving forward until such time as you advise

 7   me that it is not going to work out.  And then I will figure

 8   out what we are going to do about an attorney.

 9        Or if you are going to enter -- and you work out the

10   financial component of it, just enter just the normal notice

11   of appearance on the system and we will take it from there.

12   But I would like for you -- I don't know if the timetable is

13   too tight, but I would like to know by like close of business

14   tomorrow whether you are in or out.  I don't know if that is

15   too close -- too tight for you guys or --

16        MR. SCHAMEL:  May I approach on that issue, Your

17   Honor?  Do you mind?

18        THE COURT:  Sure, if you want.  Yes.

19        MR. SCHAMEL:  Thank you.

20        THE COURT:  Do you want the Government to come up or

21   no?

22        MR. SCHAMEL:  No, I would like to just do *ex parte*

23   on that issue.

24        THE COURT:  Okay, yes.  Sure.  All right.

25        (Whereupon, a Bench Conference followed.)

1          MR. SCHAMEL:  --- I am concerned about this.  Some

2    of the investors hired a lawyer to try to find her a lawyer.

3    They are trying to put together -- the investors are trying to

4    hire somebody to represent ---.  And so I don't know if ---.

5          THE COURT:  All right.  When do you want -- when do

6    you want me --

7          MR. SCHAMEL:  Well, I don't know how good --- doing

8    that --- at this point.  So I don't know that I will see you

9    for Monday.  And now with her being detained it is going to

10   certainly impact that.

11         THE COURT:  But she is not detained forever, but --

12         MR. SCHAMEL:  No, I understand.

13         THE COURT:  -- right now --

14         MR. SCHAMEL:  I hear what you saying.  But I -- and

15   I certainly wouldn't leave her high and dry.

16         THE COURT:  Right.

17         MR. SCHAMEL:  If I am not going to --- I will stay

18   until I file a motion to reconsider.

19         THE COURT:  Okay.  All right.

20         MR. SCHAMEL:  I will do all that.  There is a

21   meeting that I --- tomorrow and it is for a hearing Monday.

22   And then we are moving this week and I just don't know when I

23   am going to get to the jail to see her.

24         THE COURT:  Yes.  No, I understand that.  So, yes, I

25   think we are on the same -- I am going to give you enough time

1   to figure out whether you can stay to represent her or to stay

2   on the case or not.  So it doesn't have to be by Friday.  But

3   let me know sometime next week what the status is.

4              MR. SCHAMEL:  I will.  And I am going to try to talk

5   to Government Counsel and see if they have --- subpoena all

6   the lawyers --- --

7              THE COURT:  Right.

8              MR. SCHAMEL:  -- frequently hear of lawyers so want

9   three million dollars these days.

10             THE COURT:  Right.  Right.

11             MR. SCHAMEL:  --- a million dollars to do the SEC

12  stuff.  And then --- come forward.  So I got to --- my

13  position and stuff.  --- talk to them.  I will figure out

14  tomorrow.

15             THE COURT:  Okay.  That is fine.

16             MR. SCHAMEL:  But then I will -- you have my word

17  that I still stay in until we get something figured out.

18             THE COURT:  Okay.  All right.

19             MR. SCHAMEL:  Thank you, Your Honor.

20             THE COURT:  You are welcome.

21             (Whereupon, the Bench Conference was concluded.)

22             THE COURT:  All right, so based on the *ex parte*

23  conversation at the bench, I am not going to set a deadline --

24  a firm hard deadline for Counsel to advise whether he is going

25  to enter a full appearance.

1              And, Counsel, just let me know when you know.

2     Hopefully next week.  And you will -- he -- you will stay in

3     the case representing the interests of Ms. Bennett up until

4     such time either, you are no longer in the case or you are in

5     fully.  Okay?

6              MR. SCHAMEL:  Yes, Your Honor.  That is totally

7     appropriate.

8              THE COURT:  All right.

9              Government, anything else?

10             MR. WINDOM:  No, Your Honor.

11             THE COURT:  All right.

12             MR. SCHAMEL:  And then may I -- you said -- may I

13    speak with her before she is taken back?  Is there a place

14    that I can talk to the Marshals?

15             THE COURT:  Yes.  The Marshall will -- they will

16    take her back downstairs and then you can talk to her

17    downstairs.

18             Do you have the health need form that I can look at?

19             MR. SCHAMEL:  Yes.  I am going to bring that up now,

20    Your Honor.

21             THE COURT:  Great.

22             MR. WINDOM:  Your Honor, may we see you separately

23    and may we take a break for a few minutes?

24             THE COURT:  Sure.

25             MR. WINDOM:  Thank you.

1              THE COURT:  Let me just do the health needs form

2    first and then --

3              MR. WINDOM:  Yes.

4              MR. SCHAMEL:  May I approach?

5              THE COURT:  Yes.  You can just pass it to me.

6              (Pause.)

7              THE COURT:  All right.  Let's move it on.

8              All right, we will take a five minute recess.  And I

9    apologize to everybody else who is waiting.

10             All right, you guys, come on back.

11             THE CLERK:  All rise.  This Honorable Court stands

12   in recess.

13             (Whereupon, at 3:46 p.m., the proceeding concludes.)

14

15

16

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T E

      I certify that the foregoing is a correct transcript

from the duplicated electronic sound recording of the

proceedings in the above-entitled matter.

*Noemy Martinez      10/18/2017*
Noemy Martinez        Date
Transcriber