**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | **CRIMINAL NO. PX -17-472** |
| | * | |
| **DAWN J. BENNETT,** | * | |
| | * | |
| Defendant | * | |
| | * | |
| **\*\*\*\*\*\*\*** | | |

## GOVERNMENT'S MOTION TO EXCLUDE DEFENSE EXPERTS

The Government hereby moves to exclude as trial witnesses the two proposed defense experts, Jonathan Macey or Arik Van Zandt.

## Background and Procedural History

Per the Court's scheduling order, the defendant was required to provide her expert notice by September 18, 2018. ECF No. 271. The day after the deadline, defense counsel gave the following deficient expert notice, in relevant part:

> 1. Jonathan Macey, a professor at Yale University School of Law is an expert in corporate forms and securities. Mr. Macey will testify as the normal and acceptable practices of limited liability companies ("LLC") when it comes to raising capital and business operation of an LLC. Specifically, Professor Macey will testify that Ms. Bennett's modes of raising capital were reasonable as was the comingling of personal and business assets.
>
> 2. Arik Van Zandt, Managing Director, Alvarez & Marsal Valuation Services. Mr. Van Zandt is an expert in valuations of internet companies, individual net worth, and management practices. He will testify regarding Ms. Bennett's net worth, the value of DJBennett.com and its parent companies, as well as testify to the management practices of Ms. Bennett.

On September 20, 2018, defense counsel sent the Government an affidavit from Macey, attached hereto as **Exhibit A**.

Per the Court's scheduling order, the defendant was required to provide her Rule 16 reciprocal discovery by September 25, 2018.  ECF No. 271.  On the deadline, defense counsel sent the Government curricula vitae for Macey and Van Zandt, as well as certain other records not relevant to this motion.  After motions practice with respect to extending the time to make expert designations, on October 2, 2018, at 12:15 a.m.—early in the morning of the first day of trial—defense counsel sent the Government an expert report for Van Zandt, which was revised at 1:31 a.m. to correct typographical errors.  The revised Van Zandt report is appended as **Exhibit B**.  The last page of the Van Zandt report identifies the sources upon which Van Zandt allegedly relied, citing to a number of documents from Bourne, Painter & Bradley ("BPB"), an accounting firm.

On October 2, 2018, the Government asked defense counsel for all the source material relied on by Van Zandt.  On October 3, 2018, defense counsel produced some, but not all of the source material, none of which dealt with BPB, and stated its understanding that the Government already was in possession of all the source material.  On October 5, 2018, the Government asked specifically for all the BPB material, as the Government had been unable to find the BPB documents in its own productions.  On October 8, 2018, defense counsel sent the Government more than one gigabyte of BPB documents (consisting of 8,154 bates-numbered pages, files, or Excel spreadsheets)—which qualify as Rule 16 reciprocal discovery—and asserted for the first time that BPB had been engaged by the defendant's prior counsel, Dickinson Wright.

**The Macey Affidavit**

The Macey Affidavit has a few sections: (1) "Promissory Notes Are Different from Convertible Notes;" (2) "The Valuations of Business Ventures Including Limited Liability Companies (LLCs);" and (3) "Distributions by Limited Liability Companies (LLCs)."  The

Macey Affidavit generally discusses basic principles of notes, company valuation, and LLCs. At no point does the Macey Affidavit make the claims for which defense counsel gave notice on September 19, 2018, namely that "Professor Macey will testify that Ms. Bennett's modes of raising capital were reasonable as was the comingling of personal and business assets." The closest approximation to an opinion—though with grammatical errors making it virtually incomprehensible—is when the Macey Affidavit states the following: "Generally speaking, absent fraud, paying salaries and making other distributions of money from a business are ordinary and customary business practices and paying salaries and making is a business purposes of a company."

## The Van Zandt Report

The Van Zandt Report summarizes its goal: "I have been asked to review the financial and other operating information related to DJBennett.com (the 'Company') to determine whether DJBennett.com had value as of the end of 2014, at which time I understand that investors entered into promissory notes with Dawn Bennett directly and personally, and not with the Company. I have also been asked to determine whether the Company would have value currently 'but for' the arrest of Ms. Bennett and subsequent interference with the operations of the Company." Report at 1.[1]

To come to its determination, the Report relies heavily on financial statements reviewed by Bourne Painter, which cover calendar years 2012, 2013, and 2014. Report at 1-2. The Report estimates the value of DJBennett.com, at the end of 2014, to be between $550,000 and $4,000,000. Report at 8-9. The Report concludes with a series of speculations in a section titled,

---

[1] At no time does the Van Zandt Report discuss "Ms. Bennett's net worth" or "the management practices of Ms. Bennett," areas as to which defense counsel gave notice on September 19, 2018.

"Thoughts on what DJBennett.com could be worth today." Report at 9.

## Legal Analysis

The Macey Affidavit and Van Zandt Report, as well as any associated presumptive testimony, are unreliable, irrelevant, confusing, and misleading, and therefore should be excluded. Federal Rule of Evidence 702 governs the testimony of expert witnesses:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Court is given wide latitude in determining whether to admit expert testimony under Rule 702. *See United States v. Hopkins*, 310 F.3d 145, 151 (4th Cir. 2002). The Court must ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993). Expert testimony that is not relevant is not helpful to the trier of fact. *Daubert*, 509 U.S. at 591. Even if the testimony is relevant, it may be barred under Rule 403 if its probative value is substantially outweighed by the danger of confusing the issues or misleading the jury.

### A.     Macey Should Be Excluded.

Macey's presumptive testimony will not help the jury "to understand the evidence or to determine a fact in issue." In the section titled "Promissory Notes are Different from Convertible

Notes," the Macey Affidavit begins by stating Macey's "understanding that DJB Holding LLC issued promissory notes to a variety of individuals." Affidavit ¶ 9. Macey gives no explanation or source for his understanding, and he does not appear to have ever reviewed the Convertible Notes or Promissory Notes that have been introduced into evidence. His general explanation of what promissory notes may contain in other settings, *see* Affidavit ¶¶ 10-13, has no bearing on what the Convertible Notes and Promissory Notes issued by the defendant contain, nor on the other oral and written misrepresentations the defendant made outside the words on the Notes themselves. Macey's description of equity, *see* Affidavit ¶ 14, will not be helpful to a jury, as no witnesses will testify that they enjoyed the benefits of an equity position, such as voting for management or receiving distributions. And Macey's description of convertible notes, *see* Affidavit ¶ 15, adds no value to the testimony and exhibits already introduced.

In the section titled "The Valuations of Business Ventures Including Limited Liability Companies (LLCs)," Macey discusses the "several ways to value a business." Affidavit ¶ 16. At no point does he attempt a valuation of any entity relevant to this case. Nor, as discussed below with respect to the Van Zandt Report, would such a valuation relevant to this case.

In the section titled "Distributions by Limited Liability Companies (LLCs)," Macey gives a general overview of the benefits of establishing an LLC. Affidavit ¶¶ 19-26. Macey claims that the defendant, as the sole member of an LLC, "can take out remuneration or make distributions as they see fit, and may do so informally, subject to the provisions of the operating agreement, other agreements with third parties and statutory provisions on distributions." Affidavit ¶ 22. Macey apparently has not reviewed any operating agreement for DJB Holdings nor the oral and written agreements with the third-party victims as to how their funds would be used. Macey then claims that "once a distribution is made there are no limitations on how the

proceeds of the distribution are utilized." Affidavit ¶ 23. Yet Macey does not point to the defendant making any distributions to herself from DJB Holdings, and absent evidence of such distributions Macey's point is meaningless. Moreover, if the defendant did make a distribution to herself, that would stand at odds with every claim she made to testifying victims.

The Macey Affidavit then states the following, with not much clarity of language and an absence of factual support in its cited reference:

> I have reviewed an affidavit in support of the criminal complaint in this case alleges that distributions from the LLC were Distributions from DJB Holding LLC were used to pay for a luxury suite lease with the Dallas Cowboys, to make a payment to Astrological Gem in Fairfield, Iowa and to pay an expense from Puja.net, a firm in Washington State that provides clients with Hindu ritual blessings or curses performed by priests in India on behalf of clients. Once a distribution has been properly made by an LLC or other business entity, such uses of the proceeds are not improper. [Affidavit ¶ 24.]

The criminal complaint affidavit does not allege that distributions were made from the LLC; rather, it describes the fraud the defendant committed on investors. Nor will the criminal complaint affidavit be before the jury. Nor does Macey allege how the predicate of his statement—that "a distribution has been properly made"—could be satisfied.

The Macey Affidavit goes on to describe Delaware corporate law regarding the size of distributions. Affidavit ¶¶ 25-26. Introduction of that law, and the recourse if the corporate law is violated, would be confusing to the jury and irrelevant to the case.

Finally, the Macey Affidavit concludes by stating, "It is ordinary and customary business practice for people and businesses to borrow money and to use the proceeds from such borrowings to pay off prior indebtedness." Affidavit ¶ 27. This statement has no bearing on whether the defendant committed fraud with respect to the testifying victims.

### B.     Van Zandt Should Be Excluded.

As an initial matter, Van Zandt's testimony should be barred because the defendant did not produce reciprocal Rule 16 discovery until two weeks after the Court-ordered deadline. ECF No. 271. The Government now is in the position of trying to review thousands of pages of materials, and potentially having its own expert review such materials, in an extremely abbreviated timeframe, while actively putting on its own witnesses at trial. This is not the way discovery was intended to proceed, and the defendant should bear the consequences of the failure to abide by the Court's scheduling order.

Moreover, Van Zandt's presumptive testimony will not help the jury "to understand the evidence or to determine a fact in issue," and is not "based on sufficient facts or data." Van Zandt's remit, per his Report, was "to review the financial and other operating information related to DJBennett.com (the 'Company') to determine whether DJBennett.com had value as of the end of 2014, at which time I understand that investors entered into promissory notes with Dawn Bennett directly and personally, and not with the Company. I have also been asked to determine whether the Company would have value currently 'but for' the arrest of Ms. Bennett and subsequent interference with the operations of the Company." Report at 1.[2] Whether DJB Holdings ever had value, much less had it at the end of 2014, is irrelevant to this case. Moreover, Van Zandt did not rely on sufficient facts or data to come to his general conclusion

---

[2] Van Zandt too apparently has never viewed a Convertible Note or Promissory Note admitted into evidence in this case. No such notes appear in his list of relied-upon sources. *See* Report at 11 ("Appendix A"). And his description of the notes as having been entered into by victims with "Dawn Bennett directly and personally, and not with the Company" stands at stark odds with the record evidence, as well as the statement of the other defense expert, Jonathan Macey, who confirmed his "understanding that DJB Holding LLC issued promissory notes to a variety of individuals," *see* Affidavit at ¶ 9.

that DJB Holdings had an approximate valuation of $550,000 to $4,000,000 at the end of 2014.[3] Finally, Van Zandt's throw-away hunches at the end of the Report are pure speculation.

*Valuation:* The Government must prove a variety of elements for each of the charged crimes. Generally speaking, among other things, the Government must prove beyond a reasonable doubt that the defendant made fraudulent misrepresentations or omissions. The superseding indictment says nothing about the company's valuation, nor has any evidence introduced at trial intimated that the defendant lied about DJBennett.com's valuation. There is no evidence that the defendant even was aware of DJBennett.com's valuation at the times she defrauded investors and lenders out of over $20 million. Indeed, there has been no evidence at all about DJBennett.com's valuation, since the valuation is irrelevant to the charged crimes. Whether DJBennett.com was valued at zero or $100 million, that fact would have no bearing on whether the defendant, for example, submitted fraudulent 2014 or 2015 balance sheets to potential investors when trying to convince them to place investments, or submitted false asset information to EagleBank while applying for a loan. This is especially true given a valuation date of year-end 2014, which was at least three months and up to 32 months before the fraudulent misrepresentations and omissions thus far entered into evidence.[4]

*Sufficient Facts:* The Van Zandt Report relies heavily on DJB Holdings LLC financial statements "reviewed" by BPB. *See, e.g.*, Report at 2. The Government has not had the

---

[3] Van Zandt's analysis does not incorporate any discussion of the impact on valuation of the defendant—the sole member of the LLC—having been in substantial litigation with the SEC during 2014, over her fraudulent inflation of assets under management at Bennett Group Financial Services.

[4] It also is not clear whether Van Zandt has actually come up with a valuation of the company. His report states broadly that "it is possible to determine an indication of value based on the market approach" and that "in addition, the modified cost approach can be considered." Report at 4.

opportunity to review the one gigabyte of BPB documents produced earlier today, but will do so before the hearing on this motion. As a general matter, though, a review is not an audit. By design, it provides only limited assurance that no material modifications to the financial statements need be made. And the financial statements reviewed by BPB, by Van Zandt's own admission, contained a substantial error in the calculation of 2012 inventory. *See* Report at 2 (minimizing "accounting error" in financial statements by stating that the "2012 starting inventory balance does not appear to have been changed by the work done by BPB, as their work was focused on subsequent years").[5]

*Current Valuation:*  The title of the current valuation section gives away how speculative it is: "Thoughts on what DJBennett.com could be worth today." This section is bereft of expert analysis or opinion, and additionally is irrelevant to this case. Van Zandt concludes that the company could have been on an upward trajectory assuming certain future facts, such as if the company continued to "make progress on the business plan, developed a private label, and expand[ed] operations in Asia" and further had "been able to maintain the revenue growth." Report at 9-10. This hypothetical purposefully ignores the years of data following year-end 2014, including the company's mounting losses. Any current valuation also would have to grapple with the effects of the defendant's rampant fraud and lying to investors, which is not factored in to the valuation analysis.

---

[5] The financial statements provided to Van Zandt appear to be starkly different from those provided to investors. *Compare* Report at 2 (stating that net operating loss in 2014 was "under a million" dollars) *with* Trial Exhibit JL3 at 18 (showing net income of $558,790.82). If Van Zandt testifies at trial, the Government will cross-examine him with the financial statements provided to investors.

**<u>Conclusion</u>**

The Government respectfully requests that the Court exclude the proposed testimony of Macey and Van Zandt. Both experts should be available for a *voir dire* examination, outside the presence of the jury, at the agreed date of the hearing on Thursday, October 11, 2018.

    Respectfully submitted,

    Robert K. Hur
    United States Attorney

    /s/
    Thomas P. Windom
    Assistant United States Attorney