# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. PX-17-472** |
| | * | |
| **DAWN J. BENNETT,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT BENNETT'S MOTION FOR A JUDGEMENT OF ACQUITTAL OR A NEW TRIAL

The United States of America, by its undersigned counsel, submits this response to the defendant's motion for a judgement of acquittal or new trial. ECF No. 389.  For the reasons set forth below, the government respectfully requests that the Court deny the defendant's motion.

## PROCEDURAL BACKGROUND

On November 29, 2017, a grand jury returned a superseding indictment charging the defendant, Dawn J. Bennett, along with co-defendant Bradley C. Mascho, with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count Six).  ECF No. 110.  In addition, defendant Bennett, was charged with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts Two through Five); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Seven through Fifteen); bank fraud, in violation of 18 U.S.C. § 1344 (Count Sixteen); and false statements on a loan application, in violation of 18 U.S.C. § 1014 (Count Seventeen). *Id.*

Defendant Mascho pleaded guilty to conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and making a false statement, in violation of 18 U.S.C. § 1001 on June 18, 2018.  ECF Nos. 258 to 261.  On October 17, 2018, following over two weeks of trial, the defendant, Dawn Bennett, was found guilty by a jury on all seventeen counts charged in the superseding indictment. ECF No. 386.

On October 31, 2018, the defendant filed a Rule 29 motion for judgement of acquittal, or, in the alternative, a new trial, pursuant to Rule 33.  ECF 389. The defendant argues that there was insufficient evidence to support the jury's verdict and that the verdict was against the weight of the evidence.  *Id.* The government opposes this motion, and asks the Court to find that the jury reasonably concluded the defendant was guilty of counts one through seventeen of the superseding indictment.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29, the Court can "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29.  The Court should deny the defendant's motion if "after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The defendant carries the burden of establishing that he is entitled to a directed verdict. *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982).

2

Under Federal Rule of Criminal Procedure 33, the Court can grant a new trial when "the interest of justice so requires." Fed. R. Crim. P. 33(a). The Fourth Circuit has determined that a district court should "sparingly" use its discretion to grant a new trial in the interest of justice. *See United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citing *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997)). A new trial should be granted only where "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985); *see also United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) (citing *Arrington*, 757 F.2d at 1485). The defendant has not satisfied this heavy burden under either Rule 29 or Rule 33.

## EVIDENCE INTRODUCED AT TRIAL

At trial, the government introduced evidence that proved that defendant Bennett was using her internet-based sportswear company, DJB Holdings, LLC, doing business as DJBennett.com, as a vehicle to defraud individuals of their hard-earned retirement savings. The evidence proved that DJBennett.com was losing millions of dollars year after year. Bennett was the sole shareholder, owner, and operator of this company. Bennett was formerly a registered investment advisor and financial planner, and as DJBennett.com incurred large debts, in order to raise money to keep the company going, Bennett solicited financial commitments from her former financial planning clients. In doing so, however, she lied about how her company was doing and how she intended to use her investors' money.

3

In exchange for their funds, the defendant promised her investors' 15% rates of return and full liquidity.  She promised some investors equity in her company, and provided them with convertible notes. To others, she gave promissory notes. The defendant promised to use her investors' money in order to operate DJBennett.com.  After obtaining their money, however, the defendant spent millions on herself – to pay for her luxury box suite at Dallas Cowboys stadium; to pay attorneys who did work for Bennett Group Financial Services (her investment business); and for ritual prayers, astrological gems, and cosmetic treatments. The defendant also sought funding from a number of commercial lenders, including EagleBank.  With the help of her co-defendant, Brad Mascho, they submitted false documents in order to obtain a $750,000 loan from EagleBank.   The following is a summary of the testimony and evidence introduced at trial, and includes some, but not all, of the evidence introduced.

## I.      Financial Distress of DJBennett.com

To understand just how badly DJBennett.com was doing, the government introduced the defendant's individual income tax returns. Exs. BL-1, BL-2, BL-3.[1] Notably, Bennett reported DJBennett.com's income and expenses on Schedule C of her personal tax returns. According to those returns, in 2012 and 2013, the two years before the defendant began soliciting investors, her company lost $4.3 million and $2.7 million, respectively.    Ex. BL 1.  In 2014, the company lost $1.4 million, and in 2015, the

---

[1] For the convenience of the Court and the parties, the government has included all of the trial exhibits referenced herein on a disk attached as Attachment A.

company's losses soar to over $6.6 million.  Exs. BL 2, BL-3. Per the testimony of Bennett's tax return preparer and CPA, Bill Last, these returns were filed with the IRS. Moreover, the defendant had to swear to the accuracy of these tax returns under penalties of perjury.

The evidence at trial indicated that not only was the defendant aware of the numbers on these tax returns, and but that there was no reason to doubt the tax returns' accuracy. The company's accountant, Bill Last, testified that each year, he communicated with Bennett and Mascho and got the company's records, internal profit and loss statements, and balance sheets in order to prepare the tax returns. Those financial statements equally showed that the company was losing millions of dollars.  For instance, in 2013, the internal profit and loss statement showed that the company lost $1.8 million; in 2014, the internal profit and loss statement showed that the company lost $1.2 million; and in 2015, the internal profit and loss statement showed that the company lost over $6.6 million. Ex. BL-5; BL-6; BL-7. More tellingly, for 2015, the internal balance sheet that the company provided to Bill Last showed that the company owed over $6.1 million in liabilities, which was due in the next year.  Ex. BL-7. As the evidence showed, 2015 was the same year that the defendant started aggressively soliciting money from her victims.

Testimony also supported the accuracy of the tax returns and internal profit and loss statements. Jenna Bender from the FBI reviewed the company's bank records and testified about what she saw in those records.  According to a chart Ms. Bender prepared, when you set aside the money going into the company's bank accounts that wasn't revenue

(in other words, money from investors and lenders), the remaining funds align with the revenue numbers from the tax returns and the internal profit and loss statements. Ex. Chart-1b.  In other words, the tax returns, the internal profit and loss statements, and the company's bank records all indicate that DJBennett.com lost millions of dollars between 2012 and 2015.  Exs. Chart-1b; BL-5. Moreover, in the DJB Holdings bank accounts, between 2014 and 2016, there was a total of 597 times were the bank charged an insufficient fund or overdraft fee. Ex. NSF Chart 1. The evidence indicated that the defendant was well aware of her company's precarious financial situation, but lied to her investors about it.

## II.     Investor Victims

Twelve investor victims testified throughout the course of trial, demonstrating that the defendant made a combination of the same misrepresentations to all of the investors in this case.   Below is a summary of testimony for the investors referenced in the substantive counts.

### 1.  Alan Grimaldi (Count Two)

The first investor to testify at trial was Alan Grimaldi. Grimaldi was an attorney who had been practicing law for over thirty years.  Between April 2015 and February 2017, he made five investments totaling 1.9 million in DJBennett.com. Ex. iChart-7.  He lost all but 28,000.  *Id.*  According to documents and testimony introduced at trial, Bennett convinced Grimaldi to purchase the convertible notes (secured notes that gave the investor the option of owning equity in the company instead of cashing out at the end of the

investment period).  Just before his first investment, on April 6, 2015, Bennett sent offering documents to Grimaldi, that included the DJBennett.com business plan and a summary of terms.  Ex. AG-3.  According to Grimaldi's testimony, the business plan was supposed to have the information Grimaldi needed when he was deciding whether to invest.

The business plan included exaggerated revenue projections of $16.5 million in 2016 and $85 million in 2019.  Ex. AG-3.  At the time Bennett sent this business plan to Grimaldi in April 2015, DJBennett.com was in the middle of its worst year to date.  The 2016 profit and loss statements that FBI agents found when they searched DJBennett.com showed that four months into 2016, the company made $176,000 in revenue. Ex. SW-103.

The offering documents that Grimaldi received described the terms the convertible note. Ex. AG-3.  Bennett said that the note would be secured by the company's intellectual property and inventory, payable in 36 months, and would provide a 15 percent rate of return.  *Id.*  Bennett made also made the critical promise that she would use her investors' money for operating expenses. *Id.*  This was a promise that Bennett made to most, if not all, of the investors who testified.

A few months later, Bennett sent Grimaldi an email with what she called the revenue progress report. Ex. AG-11.  In that progress report, Bennett told Grimaldi and the other investors she sent this progress report to that over the previous six months, from December 2014 to May 2015, the company earned 4.8 million in revenue.  *Id.*; JB-3; Joan-3.  In May 2015 alone, Bennett represents that the company earned 1.5 million in revenue.

*Id.* From Bennett's tax returns, corroborated by the internal profit and loss statement that went to the company's accountant and the company's bank records, the evidence proved that for the whole year the company earned only 907,000 in revenue. Ex. BL-3.

After receiving the revenue progress report from Bennett, Grimaldi is impressed and writes back "nice progress" with an exclamation point. Ex. AG-12.  Ten days later, on June 24, 2015, Grimaldi signed the convertible note and made a 500,000 investment in the company (Count 2).  Ex. AG-14.

Bennett continues to make false statements to Grimaldi about the business's financial health.  In early 2016, Bennett sends an email to Grimaldi and other investors with the false 2015 profit and loss statement and balance sheet for DJBennett.com.  Ex. AG-25; DP-5; JL-18; RB-22.  In this false profit and loss statement, Bennett tells Grimaldi and the other investors that the company earned $4.7 million sales (revenue); that it had only $1.3 million in expenses and earned a positive net income of over $1.1 million. The balance sheet also reports minimal debt -- only the $750,000 line of credit from EagleBank.  *Id.*

The testimony and the evidence demonstrated that these false numbers were important to investors. For instance, after learning about the purported increased revenue, Grimaldi writes back "nice progress" with an exclamation mark. AG-12. Per the evidence and the testimony, the company's purported financial success was a large reason why Bennett's victims invested in DJBennett.com and remained invested in DJBennett.com. From the tax returns, general ledger, internal profit and loss statements that went to the

company's accountant, and bank records reviewed by Ms. Bender from the FBI, in 2015 the company made only $907,000 in revenue, had total expenses (including costs of goods sold) of over $6.4 million, and lost over $6.6 million. The company had over $6 million in debt. From the accountant's testimony, the "current liabilities" that listed on the balance sheet are debts that the company has to pay back within the next 12 months. BL-7. By the end of 2015, DJBennett.com has had its worst ever year. Revenues had fallen by 50%, expenses had tripled, and the company had to pay back $6 million over the next year. In the end, Grimaldi lost almost all of his $1.9 million investment.  Ex. iChart-7.

### 2.  Jeffrey Lazzuri (Count Three and Count Twelve)

Jeffery Lazzuri also testified that he made large investments in DJBennett.com between July 2015 and December 2016, pouring $4.1 million into the company. Ex. iChart-13.  At the end, Lazzuri lost over $3 million. *Id.*

Before the first investment, Bennett made at least two critical misrepresentations to Lazzuri. She told Lazzuri that the convertible note is highly liquid and that the security offers a guaranteed 15% rate of return. Ex. JL-3.  The jury also heard a recording of a meeting between Lazzuri and Bennett where Lazzuri urged Bennett to return some of his money, and Bennett made one excuse after another as to why she couldn't or was simply unwilling to do so. Ex. JL-42.   Further, the testimony and the evidence provided that the idea that the investment was guaranteed by the company was completely false. In late 2014, Bennett pledged 100% of DJBennett.com to Downtown Capital Partners to get a 2.1 million dollar loan. Ex. DCP-16.

In June 2015, Bennett sent Lazzuri the business plan and the convertible note. Ex. JL-3.  The business plan has the false income numbers. Through the business plan, Bennett tells Lazzuri that the company made $558,000 in 2014.  *Id.*  In reality, the company lost over $1.2 million that year. Ex. BL-6.  Every investor testified that Bennett told them the company was doing well. The evidence proved, however, that every time Bennett represented to an investor that the company made a profit in any given year, it was a misrepresentation. For 2012 through 2015 (the years surrounding the investments), DJBennett.com lost at least a million and in some years did much worse than that.

Around that time, Bennett sends the false December 2014 to May 2015 revenue progress report to Lazzuri. Ex. JL-5.  From the tax returns, internal profit and loss statement that went to the accountant, the company's bank records, the company earned only $907,000 for the entirety of 2015. BL-3. While her business's revenues were falling to practically zero, Bennett was telling investors that revenues were soaring.  Ex. Chart 7.

Shortly after Bennett sent Lazzuri the false revenue progress report, Lazzuri makes his first big investment in DJBennett.com, signing a convertible promissory note for 100,000 (Count 3).  Ex. JL-10.  In early 2016, Bennett sent Lazzuri the false 2015 profit and loss statement and balance sheet. Ex.  JL-18.  Bennett tells Lazzuri that in 2015, the company earned $4.7 million in sales, had only $1.4 million in expenses, and earned $1.1 million in net income. Moreover, the company had essentially no liabilities other than the $750,000 loan from EagleBank. The evidence provided that this was simply not true, and the defendant knew it. From the internal profit and loss statement, the company had only

10

$907,000 in revenue, $5 million in expenses, and a loss of $6.6 million. Ex. BL-7. DJBennett.com also had over $6 million in debt, which included the promissory notes Bennett sold to other investors. Six months later, Lazzuri bought a promissory note from Bennett, and invested another $1 million into DJBennett.com. Ex. iChart 13. Lazzuri ends up losing more than 75% of his $4.1 million investment in DJBennett.com. *Id.*

### 3. Julia Blankenship (Count Four)

Evidence and trial testimony proved that Julia Blankenship lost most of her $342,000 investment. On August 17, 2015, she wired $150,000 to Bennett for the purchase of a convertible note. To get Blankenship to purchase the note, Bennett sent Blankenship the fraudulent business plan and told Blankenship her money would be available whenever she needed it (which wasn't true, and in fact when Blankenship needed money to pay her taxes, she had to borrow money from Bennett). Bennett also told Blankenship that the investment money was only for DJBennett.com's development costs. Like many of the victims in this case, Bennett managed Blankenship's retirement money for decades, which helps to explain why so many of the investors trusted Bennett.

### 4. Rose Bartz (Count Five)

Rose Bartz was another securities fraud victim who purchased a convertible note from Bennett. Over three months, Bartz invested her life savings of $353,000 in Bennett's company. Ex. iChart 1. To get Bartz to invest, Bennett sent Bartz the business plan with the false 2014 profit and loss statement, the false 2015 profit and loss statement and balance sheet, and told Bartz the investment was fully liquid. Ex. RB-2.

On August 24, 2015, Bennett misrepresents the liquidity of the investment, telling Bartz that she can get her money back whenever she wants. Ex. RB-8. The following day, Bartz signed the convertible note for $253,000 (Count 5). Ex. RB-11.

In August 2016, reality sets in. Rose Bartz tells Bennett that she's suffering from the tax burden her investment caused and reminds Bennett that the investment represents her life savings. Ex. RB 28. Thirty minutes later, Bennett tells Bartz "on the contrary Rose…we are doing so well right now and I wanted you to have more of it as we grow." Ex. RB-29. Bennett continues that she did not make this call to everyone, just a few who she wanted "to receive a larger piece of the pie." *Id.* Meanwhile, the company had its worst year in 2015, losing over $6.6 million. Ex. BL-7.

### 5. Emerencia Viray (Count Seven)

Emerencia Viray testified that she invested $280,000 in DJBennett.com and got nothing back. Bennett gave Viray a fraudulent business plan, told Viray that this was a safe investment, and got Viray to invest more money by telling her there was a minimum investment of 200,000. Ex. EV-1. The business plan Bennett gave to Viray had a false profit and loss statement for January to August of 2015. In the business plan, Bennett tells Viray that the company made $3.5 million in revenue between January and August of 2015. As discussed earlier, from the internal 2015 profit and loss statement that Mascho sent the account accountant, the tax returns, the company's general ledger, and the company's bank records, the company's revenue was around $907,000 for the whole year. Furthermore, in the business plan, Bennett told Viray that other than the EagleBank line

of credit, the company has minimal debt. Testimony indicated, however, that by late 2015, the company had borrowed millions from the other victims.

Then there was this idea that Viray couldn't invest unless she gave at least $200,000 to Bennett. Testimony from other investors proved to the jury that there was not actually a minimum investment amount. For instance, Tong Le, a contractor who spent 25 years doing data entry for the USPTO, testified that he made a number of small investments in DJBennett.com. Bennett got Tong Le to invest whatever small amounts he could. Ex. iChart 14.

### 6.  Michael Fox (Count Eight and Count Nine)

Michael Fox testified that he is a museum director who needed his life savings to take care of bedridden wife. Fox invested $871,000 into Bennett's promissory notes and lost every penny. Ex. iChart 6.

In March 2015, Fox sends an email telling Bennett he doesn't want to invest in her company, making it clear to Bennett that his wife is sick and he can't afford to lose any money.  Ex. MF-3. Fox testified that he told Bennett over 50 times throughout the years that he didn't want to take any risks with his life savings. Bennett responds to Fox's email that same day, telling Fox "Mike, because of your need of guarantee, safety, and liquidity, you need to call me." Ex. MF-3.

In April 2016, Fox relents and starts investing in DJBennett.com. Fox tells Bennett that he's torn, reminding Bennett that the money is his security blanket and that it would be devastating to lose any of the investment, knowing that he could outlive his wife. Ex.

MF-3.1.

In September 2016, after Fox has invested his life savings, Bennett gets Fox to borrow more money from his life insurance plan, a loan that Fox is paying back to this day. Ex. MF-10. In total, Michael Fox has lost all of the money he invested with Bennett. Ex. iChart-6.

### 7.  Mark Hale (Count Ten)

Mark Hale testified that he made a $200,000 investments in DJBennett.com. Like other investors, he lost everything. iChart 8A. Bennett told Hale that the company was doing amazing, incredibly well, putting up big numbers, and that the investment was a guaranteed 15% rate of return. Hale testified that he was in the hospital when he got a voicemail from Bennett, who said that even though the promissory note had expired, she wasn't returning the money and was instead rolling Hale's investment into a new nine month promissory note. Ex. MH-4.  She did this without even talking to Hale.

When the notes were due and Bennett had to repay the investors, the company had no money. The operating account often had a balance of less than $5,000, sometimes in the hundreds. In fact, the evidence showed that company overdrew on its operating accounts 597 times between 2014 and 2016. Ex. NSF Chart-1. When the notes were due and Bennett had no money, testimony and evidence proved that Bennett took a number of approaches.

Bennett avoided the investors (for instance, her former employee, Mark Collins testified that she would have him tell the investors she was in China); she lied to investors

and told them the company was doing great and it wasn't a good time to take their money out of DJBennett.com; she repaid the investor with money from another investor, or as was the case of Mark Hale, she rolled the notes over into another nine month investment (in this case without talking to Hale).

### 8.  Jean Dalmas (Count Eleven)

Jean Dalmas testified that Bennett got her to sign a $150,000 promissory note by telling her that the company was doing great, the investment was fully liquid, and her money would be used for research and development. Ex. JD-8.  In exchange for her investment, the defendant provided her with promissory notes that purported to be guaranteed by Dawn Bennett and her company's assets and accounts receivable. Ex. JD-8. Based on defendant Bennett's representations about the company's success, Ms. Dalmas agreed to roll her note over. As recently as May 2017, defendant Bennett promised Ms. Dalmas 15% interest on her investment. JD-13.

### 9.  David Hanna (Count Thirteen)

David Hanna testified that he invested $283,000 into DJBennett.com and lost $184,000. Ex. iChart 9.  Bennett sent Hanna the version of the business plan with the false 2014 profit and loss statement and the false 2015 financials that Bennett sent to other investors. Ex. DH-1. Hanna's testimony demonstrates how good Bennett was at defrauding investors. Hanna was an FBI agent, and Bennett was still able to convince him that the company was doing amazingly well, that the investment was safe and liquid, and that she would use his money to operate the company.

15

### 10. Diane Keefe (Count Fourteen and Count Fifteen)

Diane Keefe testified that she poured $816,000 from her retirement into DJBennett.com and lost all of her money. Ex. iChart 12. Keefe testified that Bennett made the same misrepresentations to Keefe that she made to other investors:  that the company was highly profitable, it was growing, and the investment would be a guaranteed 15% rate of return.  Ms. Keefe also testified that the defendant drew revenue figures on a white board showing the business was continuing to make money.  Keefe also testified that Bennett went to Fidelity Bank in Bethesda, Maryland with Keefe to make sure Keefe wired her money to DJBennett.com. Ex. Fidelity 8.  Following their trip to the bank, Bennett sends Keefe a text that says "my idea is to do it again tomorrow…because after watching you interact with Fidelity…I think it gives you more piece of mind doing it person…it is more clear and transparent for you. What do you think? I say yes!!!"  Keefe's investments occurred during the first half of 2017, when the company was gasping its last breaths. Bennett's trip to the bank with Keefe indicates that Dawn Bennett was desperately defrauding yet another victim at the end of the scheme.

### III.    Bennett's Personal Use of Investor Funds

Bennett misrepresented to all of her investors how she was going to be using their money. The defendant told her investors, both verbally and in writing, that she was going to use their money to operate and grow her company.  While the defendant did spend money operating her company, she also spent over $800,000 on puja.net (priests who performed ritual ceremonies in India); $141,000 on gem stones that had astrological

purposes; $68,000 on anti-aging and weight loss treatments, and $57,000 on cosmetic treatments. Ex. Chart 3a. She also spent millions of dollars of her investors' money on her season tickets to Dallas Cowboys stadium, and paid for legal services that were unrelated to DJBennett.com. Ex. Stip-5. Bennett used money from the business's bank accounts to pay for all of these expenses. Meanwhile, her company's revenue was minimal. As Ms. Bender from the FBI testified, most of the company's cash flow came from the actual sales of products. Ex. Chart 8-A. Most of the money coming into her business's bank accounts came from investors or lenders. *Id.*

Bennett also used her investors' funds to repay other lenders – lenders whose existence she did not disclose to the investors in the first instance. For instance, on August 25, 2015, Rose Bartz invested $253,000. That same day, Bennett used $201,000 of that money to repay DCP Fulton Street (a loan to Bennett Group Financial Services, not DJBennett.com). Ex. FRB Chart-1.

On July 29, 2016, Lazzuri invests $1 million into DJBennett.com. Two days later, Bennett uses $700,000 of that money to repay DCP for the Fulton Street Loan (another loan to Bennett Group Financial Services, not DJBennett.com). Ex. Monument Chart 1.

On July 3, 2017, Diane Keefe invested $101,000. At the time of her investment, the balance in DJBennett.com's operating account a little more than $3,000. Ex. Eagle Chart 2. After receiving Keefe's money, Bennett wires $50,000 to the Dallas Cowboys, $36,000 to repay another victim, and $8,000 to her personal bank account. *Id.* Only about $6,000 of Keefe's money goes to operating the company, to pay Mark Collins, an

17

employee who testified that he lied about Bennett's whereabouts to people who called the business looking for her.  *Id.*

The timing of the wire transfers is also telling. Based on a chart prepared by Ms. Bender from the FBI, just 36 minutes after Diane Keefe's wire clears, Bennett repays $36,000 to investor Charles Eccleston.  Ex. Eagle Chart 1.  One minute after that, she sends $50,000 to the Dallas Cowboys. Similarly, on July 14, 2015, David Hanna wires $172,000 to DJBennett.com.   Ex. FRBC-1.   Just prior to receiving that money, DJBennett.com only had $4,743 in its account.  *Id.* A little over a half an hour after receiving Hanna's $172,000, Bennett wires $20,000 to her personal bank account, and just two minutes after that, Bennett paid $150,000 to the Dallas Cowboys.  *Id.*

**IV.    <u>Bennett's Fraud on EagleBank</u>**

Counts Sixteen and Seventeen focused on Bennett's fraud on EagleBank when she obtained a $750,000 line of credit on May 2015.  Len Rann, a loan officer from EagleBank, testified that before the bank extended the loan to Bennett, EagleBank wanted to know how DJBennett.com was doing and how much money Bennett had on hand. In order to get EagleBank to extend the loan in the first place, Mascho, with Bennett cc'ed, sends EagleBank some financial documents, including a fabricated brokerage statement claiming that Bennett had $4.2 million in an investment account. Ex. Eagle 3D.  This email formed the basis for Count Sixteen.  In fact, the evidence showed that that account had virtually no money in it at the time – none of Bennett's accounts at Western International Securities had any money in them. Exs. WIS 1B at 645; WIS-5.  Relying on Bennett's

representations, EagleBank extended Bennett and her company the $750,000 line of credit. Ex. Eagle-2A.1.

After EagleBank issued the loan, Bennett sends EagleBank a false 2015 profit and loss statement and balance sheet showing that DJBennett.com had no debt other than the EagleBank loan. Ex. Eagle 3P.  Then, when Bennett failed to timely repay EagleBank, she lied and told them she had been in China for eight months. Bennett's passport was introduced into evidence, and according to that passport, Bennett never went to China in 2015.  Ex. Passport-1.

## V.    Conspiracy Evidence

The testimony and evidence at trial indicated that Mascho was helping Bennett to execute the fraud from behind the scenes, nearly every step of the way. For instance, Bill Last testified that he primarily dealt with Mascho in order to obtain the financial documents Last needed to prepare Bennett's tax returns. The jury also saw emails between Last and Mascho that corroborated Last's testimony. Exs. BL-8; BL-13.

Investors testified that Mascho provided them with investment paperwork, and updates about their investments. Exs. AG-8; DH-4, DH-5; DH-6; DH-7.  Often, these emails were sent at Bennett's direction. For instance, after Blankenship decided to invest, it was Mascho who corresponded with her in order to get her to sign the convertible note. Exs. JB-4, JB-5. Similarly, it was both Bennett and Mascho who worked with Dalmas in order to provide her with signed promissory notes. Exs. JD-4; JD-5.

There was testimony from Bennett and Mascho's broker dealer, Brad Kaiser, at

Western International Securities. Kaiser discussed how it was impermissible for registered investment advisors to solicit outside investments from Western International clients without first receiving permission, and both Mascho and Bennett were aware of this. In order to allude Western International's regulations, Mascho and Bennett instructed their clients to liquidate their retirement funds (held with Western International Securities). Instead of sending those funds directly to DJBennett.com, Mascho and Bennett instructed the victim investors to direct the money first to the investors' own bank account before sending the money to DJBennett.com. Exs. AG-13; AG-14.  Mascho was instrumental in this process, and often provided the victim investors the paperwork in order to do this. After Mascho left DJBennett.com, testimony indicated that John Koorey, another employee of Bennett's filled Mascho's role. Later in the scheme, Koorey also emailed with and spoke to investors.  Ex. JD-10; MH-2. Just as Mascho did, Koorey helped investor victims to liquidate their retirement funds, move their funds into their own checking accounts, and then transfer the funds to DJBennett.com. MH-2. In addition to Koorey and Mascho, the jury might have also considered the testimony from employee Mark Collins, who said that he would lie to people who called about Bennett's whereabouts in determining whether Bennett conspired with others to commit securities fraud and wire fraud.

There were also emails between Kaiser and Mascho during the Fall of 2015 where Mascho provided Kaiser with the DJBennett.com business plan while seeking permission from Western International to sell securities. Kaiser-5. At that point, however, Bennett

and Mascho had already sold a number of convertible notes to their former clients. On November 6, 2016, regulators from FINRA performed an on-site examination at Bennett Group Financial Services (that shared office space with DJBennett.com). On November 16, 2015, shortly after FINRA's on-site examination, Bennett sends Mascho an email with a link to an article titled "Is our promissory note a security?" Ex. Email-1.  After that, Bennett and Mascho encouraged the purchasers of DJBennett.com convertible notes to execute back-dated promissory notes and sign affidavits. Ex. AG-18; DH-9.

## ARGUMENT

### I.     Defendant's motion for a judgement of acquittal should be denied.

Given the overwhelming evidence admitted at trial that supports the jury's guilty verdicts, and taking that evidence in a light most favorable to the government, the defendant's motion must be denied.

#### A.  Securities Fraud (Counts Two through Five)

The defendant argues that the evidence presented at trial was insufficient to sustain securities fraud convictions because "the government did not prove that the noteholders were deceived by Ms. Bennett's actions."  ECF No. 389 at 8.  This is simply not the case.[2]

---

[2] The defendant's argument mischaracterizes the elements of securities fraud. The subjective understanding of the investors is of little import. As this Court instructed the jury at trial -- an instruction to which the defendant had no objection -- securities fraud requires a misstatement of a material fact, and a "material fact is one that would have been significant to a reasonable investor's investment decision. This is not to say that the government must prove that the misrepresentation would have deceived a person of ordinary intelligence. Once you find that there was a material misrepresentation (or omission of a material fact), it does not matter whether the intended victims were gullible buyers or sophisticated investors, because the securities laws protect the gullible and unsophisticated as well as the experienced investor."

The victims of the securities fraud counts were Alan Grimaldi (Count Two); Jeff Lazzuri (Count Three); Julia Blankenship (Count Four); and Rose Bartz (Count Five). Each of victim investor testified at trial. The evidence proved that, in particular, these investors were deceived by Bennett's misstatements regarding (1) the business's financial health, (2) the liquidity of the investment; (3) the risk of investing in DJBennett.com; and (4) how Bennett would be using their money. Each investor testified about the DJBennett.com business plan that they received. That business plan contained a profit and loss statement, a balance sheet, and projected future revenue. The balance sheet and profit and loss statement were materially false.   These were material misrepresentations the defendant made to potential and current investors in order to entice them to invest their money in DJBennett.com. Based on the defendant's statements, these investors believed that their money was safe, when it was not. This is exactly the conduct that the Securities Exchange Act was designed to prevent. "The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting…" *Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).  In addition to their testimony, for each of the investor victims for Counts Two through Five, the government introduced signed convertible notes and bank records corroborating the funds that these investors sent to DJBennett.com. On several occasions, the investors sent these funds shortly after receiving the false business plans from Bennett. The evidence clearly indicates that these individuals were deceived— they purchased securities without knowing exactly how badly the business they were

investing in was doing.

## B.  Wire Fraud (Counts Seven through Fifteen)

With respect to the wire fraud counts, the defendant claims that the government failed to demonstrate that the defendant had the specific intent to commit wire fraud, or to deprive her victims of money.  ECF No. 389 at 8.  The evidence of the defendant's repeated lies and misstatements to her investors proved her intent.

Most of the investors who testified received some version of the DJBennett.com business plan, and relied upon the numbers in that business plan when they were deciding whether to invest. Ms. Keefe also testified that the defendant drew revenue figures on a white board showing the business was continuing to make money. The government also introduced a recorded statement of the defendant leaving a voicemail for Mr. Hale, another investor, where the defendant told Hale that he was going to "love the numbers," clearly implying that her business was doing well.  No investor testified that Bennett explained that there were risks associated with investing in her company; and no investor testified that Bennett told them that DJBennett.com was losing money. Meanwhile, the evidence demonstrated that Bennett knew her company was failing, and that was lending millions of dollars from wherever she could get it.

## C.  Bank Fraud (Count Sixteen)

With respect to the bank fraud conviction, the defendant argues that there was no evidence that she intended to defraud a financial institution because there was no actual

or potential risk of loss to EagleBank.  ECF No. 389 at 11. In the process of applying for

a $750,000 line of credit from EagleBank, Bennett, with Mascho's assistance, provided a

false brokerage statement to EagleBank. According to testimony from loan officer Len

Rann, EagleBank relied upon that document in order to determine whether to extend the

loan to Bennett and DJBennett.com. Defendant Bennett, who was the guarantor of the

loan, assured EagleBank that she had considerable assets in her brokerage account to back

the loan. In fact, this was not the case. EagleBank exposed itself to potential risk by

extending a loan to a failing business and to an individual who was already deep in debt.

The fact that EagleBank was subsequently repaid (albeit with investor funds), has no

bearing on whether the crime was committed.  *See Shaw v. United States*, 137 S. Ct. 462,

465 (2016) (while bank fraud requires "a scheme to defraud a financial institution," there

is no requirement of an ultimate financial loss, nor an intent to cause financial loss, so

long as the defendant "misled the bank in order to obtain funds" held in an account owned

by the bank).

### D.  Loan Fraud (Count Seventeen)

With respect to the loan fraud conviction, the defendant argues that there was no

evidence that the defendant made the false statements to EagleBank or that she knew that

they were false at the time they were made because Ms. Bennett only directly

communicated with EagleBank one time after the loan was granted. ECF No. 389 at 10-

11. The defendant's argument overlooks nearly all of the government's evidence on the

defendant's conduct regarding EagleBank. First, the defendant was cc'ed on the

24

correspondence with EagleBank that included her false brokerage statement. It was that email that forms the basis for Count Seventeen.   The evidence established that the defendant had hardly any funds in her brokerage account at the time this email was sent to EagleBank. In addition, the evidence established that the defendant had hardly any funds in her brokerage account in the months leading up to when she applied for this loan in the first place. This evidence is more than sufficient for the jury to find the defendant guilty of false statements on a loan application.

### E. Conspiracy to Commit Securities Fraud and Wire Fraud (Counts One and Six)

The conspiracy evidence is also more than sufficient to establish that there was a conspiracy to commit securities fraud and wire fraud. The evidence indicated that the primary individual who Bennett conspired with was Brad Mascho. Mascho, like Bennett, was well aware of the business's financial status and failing health. Mascho worked with the accountant, Bill Last, to prepare Bennett and the company's tax returns. Mascho was aware that Bennett was providing false information to investors and that they were investing in DJBennett.com. Mascho was also aware that they did not have permission from Western International Securities to sell securities to Bennett Group Financial clients. Mascho was aware of the FINRA investigation, and following FINRA's on-site examination, he helped Bennett to transform all of the convertible notes into promissory notes, and backdate the promissory notes in the process.

In reviewing the jury's verdict, the Court considers "all of the evidence in the light

most favorable to the government, assuming the jury weighed all of the evidence, resolved all conflicts in the testimony, and drew all reasonable inferences from the facts." *Wilson*, 115 F.3d at 1190. Applying that standard, Bennett has not carried her burden under Rule 29 of establishing that she is entitled to a judgement of acquittal on any of the counts.

## II.    The Defendant's motion for a new trial should be denied.

The defendant argues for a new trial under Federal Rule of Criminal Procedure 33(a) "because the interest of justice so requires;" claiming that the jury's verdicts were against the weight of the evidence.  There is simply nothing in the record to support the defendant's claim. Over two weeks of evidence, consisting of testimony from investor victims, records custodians, loan officers, a FINRA representative, the defendant's accountant, law enforcement officers, and a number of other witnesses who testified about how the defendant spent the fraud proceeds established each element of the offenses charged.  The Fourth Circuit has determined that a district court should "sparingly" use its discretion to grant a new trial in the interest of justice.  *See United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citing *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997)).  A new trial should be granted only where "the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985); *see also United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) (citing *Arrington*, 757 F.2d at 1485).  The defendant has not satisfied this heavy burden under either Rule 29 or Rule 33.

## **CONCLUSION**

The government respectfully requests that the Court deny the defendant's motion

for judgement of acquittal or a new trial.


Respectfully submitted,

Robert K. Hur
United States Attorney

*/s/ Erin B. Pulice*
Erin B. Pulice
Thomas P. Windom
Gregory D. Bernstein
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Erin B. Pulice*_____
Erin B. Pulice
Assistant United States Attorney